757 So.2d 1043 (2000)
Bradley Carroll MOORE, Appellant,
v.
Mary Ann (Heard) MOORE, Appellee.
No. 1998-CA-01437-COA.
Court of Appeals of Mississippi.
March 21, 2000.
*1044 Robert H. Broome, Batesville, Attorney for Appellant.
Mary Lee Walker Brown, Hernando, Attorney for Appellee.
BEFORE McMILLIN, C.J., BRIDGES, AND PAYNE, JJ.
PAYNE, J., for the Court:

PROCEDURAL POSTURE AND ISSUES PRESENTED
¶ 1. This case is before the Court challenging the judgment of divorce and related matters in favor of Mary Ann Heard Moore entered by the Chancery Court of DeSoto County. Feeling aggrieved, Brad Moore perfected this appeal raising the following four issues[1] for our review: 1) whether the chancellor violated Brad's due process rights under the Mississippi Constitution by imposing a time limitation on testimony and evidence as to the issues of child custody, child support, property division, alimony, attorney's fees, and issues raised in Brad's counter-complaint for divorce; 2) whether the chancellor erred in granting Mary Ann a divorce on the grounds of habitual cruel and inhuman treatment; 3) whether the chancellor erred in awarding custody of the minor child, Pierce Moore, to Mary Ann in light of the child's stated preference to live with Brad and whether the chancellor further erred in not making specific findings as to why the court did not respect the wishes of the child; and 4) whether the chancellor erred in awarding Mary Ann child support in the amount of $1,238 per month, an amount in excess of the statutory guidelines.

FACTS
¶ 2. Brad, a real estate broker/developer and owner of two businessesNoxubee Investment Corporation, Incorporated and the Marley Companyand Mary Ann, a homemaker and assistant in Brad's business ventures, were married in 1984. The union produced three children: Pierce, Stephen, and Nathan. Brad left the marital home in October 1997. However, the *1045 couple continued to have marital relations on occasion until the couple finally separated in January 1998, and Mary Ann filed for divorce on the grounds of habitual cruel and inhuman treatment, adultery, or, in the alternative, irreconcilable differences. Mary Ann's suspicions about Brad's adultery involved Brad's business associate, Kim Tatum. Mary Ann sought custody of the three minor children, child support, alimony, and legal fees. Brad answered and filed a counter-complaint alleging recrimination and provocation against Mary Ann, though admitting that the couple had irreconcilable differences. Brad sought custody of the minor children, child support, and legal fees. Mary Ann answered the counter-complaint, denying all allegations and moved for dismissal of the counter suit.
¶ 3. On March 9, 1998, DeSoto County Chancellor Percy Lynchard, Jr. entered a temporary order granting Mary Ann use of the marital home as well as custody of the minor children. In addition, Brad was ordered to have no physical contact with Mary Ann save for picking up the children for scheduled visits from the driveway of the home and returning them there. Brad was ordered to pay the operational expenses of the home (e.g., mortgage note, utility charges, insurance premiums, etc.).
¶ 4. On April 30, 1998, Brad filed for an emergency modification of the temporary order seeking custody of the minor children. Brad alleged that the children were being neglected. Further, Brad asserted that the two oldest children ran away from Mary Ann's home and called him to come and get them. Brad submitted affidavits from the two oldest children expressing their desire to live with Brad and their intention to leave home again if they were forced to stay with Mary Ann. Brad also submitted a letter from psychologist, Dr. Rebecca Caperton, which supported Brad's petition. Dr. Caperton averred that she interviewed the three children, and she related very disturbing revelations from the children about Mary Ann's behavior and treatment of them. Mary Ann answered Brad's emergency petition alleging that Brad was, in essence, manipulating the minor children in an effort to avoid having to abide by the chancellor's temporary custody and support order. Brad's emergency petition was denied.
¶ 5. A full hearing was held on the merits of marital dissolution, property division, and child custody on May 27, 1998. Pursuant to Rule 611 of the Mississippi Rules of Evidence, the chancellor limited each party's presentation of evidence to two and one-half hours, including direct examination, cross-examination, redirect examination, and the presentation of rebuttal evidence. After hearing all the testimonial evidence and reviewing the documentary evidence, the learned chancellor entered his written findings on June 12, 1998, nunc pro tunc to May 28, 1998.
¶ 6. The chancellor granted Mary Ann a divorce on the grounds of habitual cruel and inhuman treatment and denied Brad's counter-complaint for divorce. Mary Ann was awarded custody of the minor children with reasonable visitation rights afforded to Brad. Brad was ordered to pay Mary Ann $1,238 per month in child support for the care of the children, as well as to maintain health insurance on the children, and life insurance on himself for the benefit of the minor children.
¶ 7. Mary Ann was awarded the marital home for a period of three years or until the home was sold with Brad being responsible for the monthly mortgage on the property during this period. At the end of the three year period, Mary Ann was to become responsible for the house note until the property was sold and the equity divided between Brad and Mary Ann.
¶ 8. Brad was awarded sole ownership of the two corporations. An individual retirement account held by the parties with Minnesota Mutual was ordered divided equally between Mary Ann and Brad, and the cash value of a life insurance policy was ordered equally divided between the *1046 former couple. Mary Ann received an award of attorney's fees in the amount of $4,957.40.
¶ 9. Brad filed a motion to vacate the judgment of divorce and for a new trial on June 18, 1998. After Chancellor Lynchard had entered his order in this matter and after Brad filed his motion to vacate judgment, a conflict arose necessitating Judge Lynchard's recusal from further participation in this case.[2] The recusal order was entered on June 29, 1998. The case was reassigned to the docket of Chancellor Dennis Baker by order entered July 24, 1998. On August 6, 1998, Chancellor Baker conducted a hearing on Brad's motion to vacate Judge Lynchard's judgment and for a new trial on the issue of divorce. On September 4, 1998, Chancellor Baker denied Brad's motion.
¶ 10. Judge Baker's denial of Brad's motion for a new trial resulted in Brad's timely perfecting this appeal. Finding no error in Judge Lynchard's decision or in Judge Baker's decision sustaining Judge Lynchard's decision, we affirm.

ANALYSIS AND DISCUSSION

I. WHETHER THE CHANCELLOR VIOLATED BRAD'S DUE PROCESS RIGHTS UNDER THE MISSISSIPPI CONSTITUTION BY IMPOSING A TIME LIMITATION ON TESTIMONY AND EVIDENCE AS TO THE ISSUES OF CHILD CUSTODY, CHILD SUPPORT, PROPERTY DIVISION, ALIMONY, ATTORNEY'S FEES, AND ISSUES RAISED IN BRAD'S COUNTER COMPLAINT FOR DIVORCE.
¶ 11. As his first assignment of error, Brad asserts that his due process rights, guaranteed by Article 3 Section 14 of the Mississippi Constitution, were violated when Judge Lynchard limited the trial of this matter to one day. While this argument is one of great import, as due process is fundamental to our judicial system, the facts in the case sub judice render meritless Brad's claim of denial of due process. Accordingly, this assignment of error is without merit.
¶ 12. The record is clear from the outset that Chancellor Lynchard placed the one day time limit on the parties. Brad could have requested a continuance, but he did not. Brad could have objected on the record to the time limit, but he did not. In fact, the record shows that Brad's counsel indicated a readiness to go forward at the end of Mary Ann's case-in-chief after Brad's motion for a directed verdict was overruled by the trial court. There is no indication in the record from Brad that the time limits placed on the trial by the chancellor were problematic.
¶ 13. "Every defendant has a right to introduce evidence at a hearing." Morreale v. Morreale, 646 So.2d 1264, 1270 (Miss.1994) (citing Edwards v. James, 453 So.2d 684, 686 (Miss.1984)). But, if there is no evidence to present or no proffer as to what would have been presented, then there is no legitimate basis for complaining on appeal about the chancellor's control of evidentiary presentations. Id.
¶ 14. The record indicates that Brad called seven witnesses during the trial, in addition to testifying himself. While Brad, as well as many other litigants we are sure, would like to have unlimited time in which to present evidence in support of their positions during litigation, Rule 611 of the Mississippi Rules of Evidence is designed to give trial judges some measure of control over the operation of trials and the smooth flow of the litigation process. Chancellor Lynchard set out the time limits at the beginning of the trial. *1047 Brad knew he only had a limited time to present his case. If Brad's trial strategy was adversely affected, then a record outlining the adverse effect should have been preserved for this Court's review. However, knowing the time limits placed by the chancellor from the beginning, Brad raised no objections in the record. Based on the record before us, we find Brad was afforded adequate due process.

II. WHETHER THE CHANCELLOR ERRED IN GRANTING MARY ANN A DIVORCE ON THE GROUNDS OF HABITUAL CRUEL AND INHUMAN TREATMENT.
¶ 15. We next address Brad's suggestion that the chancellor manifestly erred in granting Mary Ann's petition for divorce on the grounds of habitual cruel and inhuman treatment. Our review of the record leads us to the conclusion that Brad's citation of error in this regard is without merit. Accordingly, we affirm.
¶ 16. This Court has addressed the issue of a fault-based marriage dissolution under Mississippi law for habitual cruel and inhuman treatment:
Habitual cruel and inhuman treatment can be established by demonstrating conduct that threatens the life, limb, or health of the party seeking relief, or the conduct is so unnatural and infamous as to make disgusting and revolting to the non-offending spouse the discharge of marital duties, which erases the basis for the union.
Mixon v. Mixon, 724 So.2d 956, 959(¶ 9) (Miss.Ct.App.1998) (citing Richard v. Richard, 711 So.2d 884, 888 (Miss.1998)). Further, "the habitual cruel and inhuman treatment must be shown to be routine and continuous; however, a single occurrence may be grounds for a divorce on this ground." Id. (citing McKee v. Flynt, 630 So.2d 44, 48 (Miss.1993)).
¶ 17. Mary Ann testified to verbal and emotional abuse from Brad throughout the marriage, specifically Brad's berating and criticizing of her in the presence of the minor children. Mary Ann related two occasions when Brad threw things across the room: once a tape recorder and once a garbage can. According to Mary Ann, Brad would call her stupid and humiliate her in public. Brad seemed to enjoy making Mary Ann feel inferior but would often build her up and then tear her back down. Brad demonstrated a total disregard for Mary Ann's feelings in part by being very flirtatious with Kim Tatum in Mary Ann's presence.
¶ 18. Mary Ann identified four specific occasions during the course of the marriage that Brad physically abused her, twice on the night that he finally left the marital home in October 1997. Mary Ann testified that there were other abusive episodes throughout the marriage when Brad was intoxicated, but that she did not consider those incidents relevant because he was drinking at the time.
¶ 19. The first incident of physical abuse described by Mary Ann was an incident immediately following a session of sexual intercourse with Brad in July 1997. On advice of her marriage counselor, Mary Ann, suspicious of Brad's extra-marital escapades with Kim Tatum, inquired of Brad why he felt he needed another woman: "Honey, why would you want hamburger when you've got steak?" Mary Ann testified that Brad responded in a violent fashion, rolled on top of her, grabbed her around her neck and forcefully shook her while yelling profanities. Mary Ann suffered no bruises but was humiliated by the event.
¶ 20. Brad testified that after the lovemaking session, Mary Ann made the comment about hamburger and steak. Brad told her if she was going "to start in" on that he was leaving, and he went to get up out of the bed. Brad says Mary Ann grabbed him. Brad attempted to push her hand away, and she locked her arms around his waist. Brad then turned and put his hand on her face and pushed her back into the pillow and told Mary Ann to *1048 leave him alone. Brad denies having assaulted Mary Ann on this occasion.
¶ 21. The second incident of physical violence testified to by Mary Ann occurred at Brad's business office in August 1997. Mary Ann testified that she discovered a separate checking account held by Brad solely in his name and of which Mary Ann had no knowledge. Mary Ann inquired about the account which sparked a violent response from Brad. According to Mary Ann's account of events, Brad grabbed her by her hair and pulled her out of her chair and threw her into an office filing cabinet. Brad repeatedly told Mary Ann she was crazy. Eventually, Brad picked up Mary Ann by her belt loops and hair, carried her to the door, and shoved her out of the door. Mary Ann testified that she was severely bruised following this incident.
¶ 22. Brad admitted opening the second account. However, Brad maintains that the account was opened not to hide money from Mary Ann but on the advice of his corporate accountant not to co-mingle personal funds with corporate funds. Brad says that Mary Ann instigated an argument in this regard. According to Brad, Mary Ann ripped a blank check from the checkbook of the corporate account, and Brad demanded that Mary Ann return it. When she refused, Brad went around the desk and unsuccessfully attempted to retrieve the check from Mary Ann. Brad denies having grabbed Mary Ann's hair but admits to taking her by the arm and leading her out of the office to the outside. James Scruggs, a sub-contractor for Brad's company, testified that he heard the verbal argument between Mary Ann and Brad at the office. Scruggs felt it was none of his business and dismissed it as a "husband and wife thing." Scruggs saw no physical acts of violence committed by Brad against Mary Ann during this heated episode.
¶ 23. The final two identified incidents occurred on the evening that Brad permanently left the marital home in October 1997. Mary Ann's and Brad's accounts differ dramatically. First, Mary Ann testified that on the evening in question she had prepared dinner. Brad came home and was unhappy with the menu. Brad went into an angry rage and began arguing with Mary Ann. Brad backed Mary Ann into the couple's bed and "bowed up" at her in a threatening posture. Brad told Mary Ann he did not love her. Mary Ann responded by slapping Brad, which he returned with a slap of Mary Ann. When she tried to retreat, Brad pushed her against the bed and hit her as hard as he could, resulting in the injury to Mary Ann's jaw. Also, Brad choked Mary Ann resulting in her striking Brad in self-defense.
¶ 24. Brad testified that Mary Ann was "chewing on" him, an apparent reference to arguing with him. Brad discouraged Mary Ann from arguing and went into another room. Mary Ann followed. Brad again asked her to leave him alone. Mary Ann persisted. Eventually, Brad admitted telling Mary Ann that he did not love her. When Mary Ann slapped him, he retaliated by slapping her.
¶ 25. In addition, corroborating witnesses testified for both Mary Ann and Brad as to Mary Ann's allegations of abuse by Brad. For example, Trudy Peden was a neighbor of the Moores for five years as well as a part-time employee of Brad's company. Peden testified that she witnessed what she considered both verbal and physical abuse inflicted by Brad against Mary Ann, including "violent lunges" as well as two occasions where Brad would "jab" Mary Ann with the door of a truck. Peden also testified that she had seen bruises on Mary Ann's person. However, on cross-examination, Peden admitted that she never saw Brad actually strike Mary Ann. Peden also testified that she suspected Brad was having an extramarital affair with Kim Tatum.
¶ 26. Further, Dr. Eleanor Gill, Mary Ann's dentist, testified by deposition. Dr. Gill noted that Mary Ann suffered from temporomandibular joint (TMJ) syndrome *1049 for which Dr. Gill fitted Mary Ann with a night guard to stabilize the jaw. In addition, Dr. Gill testified that Mary Ann came to her with a broken molar tooth. While Dr. Gill admitted that the cause of the TMJ and the broken tooth could have come from other trauma, her medical opinion was that both the broken tooth and the TMJ resulted from Brad's physical abuse of Mary Ann on the October night that Brad finally left the marital dwelling, as related to her by Mary Ann.
¶ 27. Esther Egley, Brad's and Mary Ann's neighbor, testified that she had witnessed Brad demean Mary Ann in public. One incident in particular occurred at a lake gathering. Mary Ann was attempting to ski but could not get out of the water on the skis. Brad screamed at her and told her she was stupid. Also, Egley testified that Brad told her that there was another woman in his life named Kim, and he could just leave Mary Ann but he wanted to "smear" her. Egley characterized Brad as being very vindictive. In addition to Egley, Pam Tacker testified that on the morning Brad was served with Mary Ann's suit for divorce, she overheard Brad screaming at Mary Ann while the two were sitting in a pick-up in the parking lot of a local business. Tacker walked near the truck, and she was embarrassed for Mary Ann.
¶ 28. Brad maintains that he never abused Mary Ann and, again, only struck her when she first struck him. According to Brad, all of the incidents of physical altercations resulted from Mary Ann's instigation. Katherine Parish testified for Brad. Parish was Kim Tatum's roommate. Parish admitted that Brad had spent the night at her apartment while Tatum was there, but that Brad and Tatum never shared a bed. Parish was unaware of any occasions when Tatum and Brad engaged in sexual intercourse. Parish testified she had never witnessed any physical altercation between Brad and Mary Ann nor had she seen any bruises on Mary Ann's body. Parish testified that Brad and Tatum had strong affections for each other but only on the level of friendship and nothing more.
¶ 29. Brad also presented testimony from Rebecca Fowler and Angela Hodge. Both Fowler, one of Brad's home buyers, and Hodge, another of Brad's and Mary Ann's neighbors, testified that they never witnessed any physical violence by Brad against Mary Ann. Hodge testified that she was aware of the incident that occurred on the night Brad moved out of the marital home. Further, Hodge noted that she told Mary Ann that she would not tolerate Brad's verbal abuse.
¶ 30. Based on the record before us, we cannot say that the chancellor manifestly erred in his decision to grant Mary Ann a divorce on the grounds of habitual cruel and inhuman treatment. While the incidents of physical abuse were limited in number, the impact of those few incidents on Mary Ann is not lessened, particularly the injuries to her jaw and tooth. Those incidents of violent behavior, coupled with the emotional and verbal abuse inflicted on Mary Ann by Brad, led Mary Ann into depression requiring her, by her testimony, to take anti-depressants. The chancellor considered all the testimony and determined that Mary Ann proved by a preponderance of the evidence that she was entitled to a divorce on the grounds of habitual cruel and inhuman treatment. Dorman v. Dorman, 737 So.2d 426, 430(¶ 8) (Miss.Ct.App.1999). We decline to disturb the chancellor's findings.

III. WHETHER THE CHANCELLOR ERRED IN AWARDING CUSTODY OF THE MINOR CHILD, PIERCE MOORE, TO MARY ANN IN LIGHT OF THE CHILD'S STATED PREFERENCE TO LIVE WITH BRAD AND WHETHER THE CHANCELLOR FURTHER ERRED IN NOT MAKING SPECIFIC FINDINGS AS TO WHY THE COURT DID NOT RESPECT THE WISHES OF THE CHILD.
*1050 ¶ 31. Brad next challenges the chancellor's custody decision. Brad maintains that since Pierce, the oldest child, expressed a definite preference to live with him instead of Mary Ann, the chancellor erred in not placing Pierce in Brad's custody. Further, Brad maintains the chancellor erred in not making an on-the-record finding about his decision in this regard. Mary Ann maintains that the siblings' best interest would not be served by separating them.
¶ 32. Our review of the record finds that Chancellor Lynchard did make an on-the-record finding about Pierce's expressed preference to live with Brad. However, the chancellor noted that the child's preference is but one factor, and the polestar consideration in child custody decisions is the best interest of the children, pursuant to the well-known Albright factors: age and health of the children, sex of the children, a determination of the parent that has had the continuity of care prior to the separation, which parent has the best parenting skills and which parent has the willingness and capacity to provide primary child care, the employment of the parents and the responsibilities of that employment, the physical and mental health and age of the parents, the emotional ties of parents and children, the moral fitness of parents, the home, school and community record of the children, the preference of the child at the age sufficient to express a preference by law, the stability of home environment, and other factors relevant to the parent-child relationship. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). In balance with the other Albright factors and the best interests of the children, the chancellor found that it was not in the children's best interest to live with their father nor to split the children apart by allowing Pierce to live with Brad. These findings are sufficient for this Court to sustain the custody decision.

IV. WHETHER THE CHANCELLOR ERRED IN AWARDING MARY ANN CHILD SUPPORT IN THE AMOUNT OF $1,238 PER MONTH, AN AMOUNT IN EXCESS OF THE STATUTORY GUIDELINES.
¶ 33. Finally, Brad submits error by the chancellor in the award of child support, claiming that the amount awarded exceeds the statutory maximums for his income bracket. Brad claimed that he made only $3,000 per month, which at twenty-two percent would be $660 in child support. Brad complains that he was unable to fully develop his financial situation and therefore the chancellor should be reversed. Mary Ann counters, noting that Brad's financial declaration was not supported by any documentation.
¶ 34. The chancellor admitted that Brad's financial condition was speculative at best. But, the chancellor did not have Brad's 1997 income tax returns available to him, and Mary Ann provided no guidance to the trial court as to the amount of Brad's income. The chancellor arrived at Brad's income by referencing loan applications to banking institutions made by Brad for financial support of his home construction venture. In those loan applications, the chancellor found that Brad consistently reported his annual income to be approximately $90,000. The chancellor made allowance for twenty-five percent in taxes, making Brad's net income a total of $67,500, twenty-two percent of which is the amount awarded by the chancellor for support of the three minor children. The statutory guidelines for the support of three children is twenty-two percent of the non-custodial parent's income. Miss.Code Ann. § 43-19-101(1) (Rev.1993).
¶ 35. Brad may be correct in his assertion regarding his income levels, but the chancellor crafted the best award he could with the evidence he had before him at the time of the hearing. We decline to disturb his findings.
¶ 36. THE JUDGMENT OF THE DESOTO CHANCERY COURT IS AFFIRMED. STATUTORY DAMAGES AND INTEREST ARE AWARDED. *1051 ALL COSTS OF THIS APPEAL ARE TAXED AGAINST THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, IRVING, LEE, MOORE, AND THOMAS, JJ., CONCUR.
NOTES
[1] As Brad's second and third listed issues are controlled by Brad's fourth issue, we have chosen to renumber the issues and will discuss them in the order set out above rather than in the order presented in his brief.
[2] Affidavits related to Judge Lynchard's recusal from this case, as well as other counsel conflicts, were submitted with the record of this matter. As the events leading to Judge Lynchard's recusal and the other counsel conflicts arose after Judge Lynchard's initial ruling, we find these not relevant to the merits of this case. Accordingly, no discussion of the recusal and related events is necessary.