MAXWELL, J.,
for the Court:
¶ 1. Courtney Harmon appeals the grant of divorce to his former wife, Linda Harmon, insisting there were no grounds for a cruelty-based divorce. After review, we find his continuous name calling, baseless adultery accusations, habitual gambling, and stalking made the marriage revolting to Linda, destroying the basis for the marriage. We thus affirm the grant of divorce.
¶2. We also find no merit to Courtney’s claims that the chancellor wrongly awarded Linda the Starkville home and failed to decide who got the West Point home. Our review shows the chancellor properly applied the Ferguson[1] factors when dividing the assets and awarding Linda the Starkville house. And from the final judgment of divorce, it is clear the chancellor deemed the West *40 Point home was Courtney’s separate property. We affirm.[2]
Facts and Procedural History
¶ 3. Courtney and Linda married on June 10, 2006. After marrying, they moved into Courtney’s West Point, Mississippi home.[3] They lived in that house for nine months, then moved into Linda’s father’s house in Starkville, Mississippi. In May 2009, they moved into a newly constructed home in Starkville.
¶ 4. The next year, the couple separated on October 25, 2010. And on November 4, 2010, Linda filed for divorce on the grounds of adultery, habitual cruel and inhuman treatment, and alternatively, irreconcilable differences. After a temporary hearing, the chancellor awarded Courtney the West Point home and Linda the Starkville home. A three-day trial started on September 8, 2011.
¶ 5. According to Linda, early in the marriage, Courtney often accused her of cheating. And he often called Linda derogatory names like “whore” and “bitch.” Linda also testified that Courtney made degrading sexual comments about her anatomy and terrible false claims about her.
¶ 6. Linda’s fourteen-year-old daughter from an earlier relationship, Taylar Ran-dle, lived with Linda and Courtney. She recalled many arguments between the two. She told the chancellor that Courtney was
“very cruel” to her mother. And “he said very ugly things,” — words “a husband should not say to his wife.” Courtney also frequently accused Linda of cheating. The situation was so bad Taylar had thoughts of suicide and killing Courtney because of how he treated her mother.
¶ 7. Linda explained that Courtney called and followed her nonstop. Almost daily, he came to the bank where she worked as a branch manager. Two of Linda’s coworkers testified that Courtney was constantly at the bank. And after visits, Linda tended to get upset and was agitated, sad, and hurt. According to Linda, whenever she had a male customer in her office, Courtney accused her of infidelity. This interference with Linda’s work made it difficult for her to function.
¶ 8. Courtney was also obsessed with Linda’s whereabouts. He often followed her when she left work for lunch. One time, Linda was at a movie when Courtney appeared unexpectedly, frightening her. Another time, after watching a movie with a friend, she found Courtney lurking in the movie theater parking lot near midnight. As Linda put it, he “follows me everywhere.”
¶ 9. Courtney’s unusual behavior led to Linda filing stalking and phone-harassment charges against him in September 2011.[4] And his actions caused Linda’s health to decline. She lost weight and sleep, and her hair began falling out. She *41 testified she was afraid of Courtney and began to withdraw from others.
¶ 10. Linda also claimed Courtney was a habitual gambler. Linda admitted that early in the marriage she accompanied Courtney to the casino. But when she learned his gambling had become excessive, she asked him to stop. He refused. Bank statements showed Courtney withdrew over $11,000 at the casinos. Yet Linda believed he spent much more, anywhere from $500 to $1,000 a month gambling — money they needed for bills.
¶ 11. Despite Linda’s testimony and the bank records, Courtney denied his gambling was a problem. He also expressed his love for Linda and stated that he did not want a divorce. He denied calling her names and the sexually degrading behavior. Courtney also disputed that he constantly accused Linda of infidelity. He maintained the two continued to have sex after they separated, though Linda denied this.
¶ 12. After a trial, the chancellor granted Linda a divorce based on Courtney’s cruelty and divided the marital property. Courtney appealed.
Discussion
¶ 13. Chancellors are given wide latitude in fashioning equitable remedies in domestic cases. Smith v. Smith, 90 So.3d 1259, 1262 (¶ 7) (Miss.CtApp.2011). Then-decisions will not be reversed if their findings are supported by substantial credible evidence. Id. “We will not disturb a chancellor’s factual findings unless the chancellor’s decision was manifestly wrong or clearly erroneous, or the chancellor applied an improper legal standard.” Id. (citing Wallace v. Wallace, 12 So.3d 572, 575 (¶ 12) (Miss.Ct.App.2009)).
I. Habitual Cruel and Inhuman Treatment
¶ 14. Courtney first argues the chancellor wrongly granted Linda a divorce based on habitual cruelty. See Miss. Code Ann. § 93-5-1 (Rev.2013). To prove cruelty, a party must show conduct that either:
(1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the non[]offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.
Smith, 90 So.3d at 1262 (¶ 10) (quoting Richard v. Richard, 711 So.2d 884, 889 (¶22) (Miss.1998)). “The conduct must consist of something more than unkindness or rudeness[.]” Jackson v. Jackson, 922 So.2d 53, 56 (¶4) (Miss.Ct.App.2006) (quoting Horn v. Horn, 909 So.2d 1151, 1155 (¶ 7) (Miss.Ct.App.2005)). Want of affection or incompatibility is not enough. Id. The complaining party must prove one of these two prongs by a preponderance of the credible evidence. Smith, 90 So.3d at 1262-63 (¶ 10).
¶ 15. Generally, habitually cruel conduct must be “routine and continuous.” Jackson, 922 So.2d at 56 (¶ 4) (citing Moore v. Moore, 757 So.2d 1043, 1047 (¶ 16) (Miss.Ct.App.2000)). However, a pattern is not always required. Sometimes, a single act of physical violence is sufficient. Smith, 90 So.3d at 1263 (¶ 13) (citing Curtis v. Curtis, 796 So.2d 1044, 1047 (¶8) (Miss.Ct.App.2001)). But in cases like this where there is no physical violence, we consider the frequency and severity of the conduct, and the impact on the offended spouse. Id. “[V]erbal abuse, neglect, and the like,” considered independently, will not amount to cruelty. Id. (quoting Jackson, 922 So.2d at 57 (¶ 8)). *42 But if these combined acts manifest a course of revolting conduct, they may give rise to cruelty. Id.
¶ 16. In reviewing a cruelty-based divorce, “there is a dual focus on the conduct of the offending spouse and the impact of that conduct on the offended spouse.” Id. at 1263 (¶ 11) (quoting Bodne v. King, 835 So.2d 52, 59 (¶ 24) (Miss.2003)). This specific inquiry is subjective. Id. (citing Faries v. Faries, 607 So.2d 1204, 1209 (Miss.1992)). Instead of using an ordinary, reasonable-person standard, we concentrate on the conduct’s effect on the particular offended spouse. Id. (citing Faries, 607 So.2d at 1209). Though a party alleging cruelty must generally corroborate his or her testimony, an exception is made “where corroboration is not reasonably possible because of the nature of the accusation.” Id. at (¶ 12).[5]
¶ 17. The chancellor here determined the “cumulative effect of the degrading sexual behavior, cursing and yelling, habitual gambling, jealousy, [and] stalking,” and the resulting negative effect to Linda’s health amounted to habitual cruel and inhuman treatment. Linda testified about these behaviors and the adverse effects on her health. And Linda’s daughter and coworkers corroborated Linda’s testimony that Courtney’s behavior adversely affected her. The chancellor found this testimony credible. After review, we find Courtney’s overall pattern of behavior, taken as a whole, was sufficiently revolting to Linda to support a divorce based on habitual cruelty.
II. Equitable Distribution
¶ 18. Courtney next challenges the distribution of assets. He claims the chancellor erred in not deciding who received the West Point home and in awarding Linda the Starkville home. We disagree.
¶ 19. In Mississippi, equitable distribution is a three-step process. The chancellor must “(1) classify the parties’ assets as marital or separate, (2) determine the value of those assets, and (3) divide the marital estate equitably based upon the factors set forth in Ferguson.” Rhodes v. Rhodes, 52 So.3d 430, 436 (¶ 18) (Miss.Ct.App.2011) (citation omitted) (citing Ferguson v. Ferguson, 639 So.2d 921, 928-29 (Miss.1994)).
A. Classification of Assets
¶ 20. The first step requires classifying assets as marital or separate. Marital property is “any and all property acquired or accumulated during the marriage.” Id. at (¶ 19) (quoting Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss.1994)). Nonmarital assets (or separate property) are those assets “attributable to one of the parties’ separate estates prior to the marriage or outside the marriage.” Id. (quoting Hemsley, 639 So.2d at 914). Marital property must be divided, while nonmarital property is generally not subject to equitable distribution. Id. (citing Larue v. Larue, 969 So.2d 99, 106 (¶ 19) (Miss.Ct.App.2007)).
¶21. The marital assets here were a lawn mower, television sets, an entertainment center, vehicles, Courtney’s and Linda’s 401(k)s, the marital home, and four bedroom suites. Though Courtney argues about the chancellor’s failure to award him *43 the West Point home, we point out the chancellor did not classify this house as marital property. She instead deemed it Courtney’s separate, nonmarital property.[6] So we find he did receive the West Point home.
¶ 22. While Courtney argued the West Point home was titled in his and his daughter’s names,[7] regardless of title, which is irrelevant for purposes of equitable distribution,[8] the chancellor’s final judgment directed the parties to “execute any deed, title transferí,] or other instrument necessary to effect the above property division and distribution.” Because we find Courtney received the West Point home, Linda must execute any instrument necessary to effect this particular ruling.
B. Value of Marital Assets
¶23. The chancellor next valued the marital assets. She found the Starkville home was worth $250,000, less a mortgage balance of $196,000, leaving $54,000 in equity. Linda’s 401(k) was valued at $15,104, and Courtney’s at $8,500. The parties had several bedroom suites, which the chancellor deemed were worth $8,900. The televisions were valued at $2,400, the entertainment center at $2,900, and a zero-turn mower at $2,900. The couple also had several vehicles — a 2002 Nissan with equity of $8,000, a 2002 Dodge with equity of $4,000, a 1994 Honda Accord with equity of $2,875, and a 2008 BMW 5 Series with $2,000 in equity.
C. Division of Marital Assets by Applying the Ferguson Factors
¶ 24. After valuing the marital assets, the chancellor went through the Ferguson factors,[9] equitably dividing the *44 marital assets. Though Courtney does not challenge any specific factor, he suggests he should have received the Starkville home or some equity in it.
¶ 25. When reviewing an equitable distribution, we focus on “the chancellor’s findings on the Ferguson factors — ‘we do not conduct a Ferguson analysis anew.’ ” Carter v. Carter, 98 So.3d 1109, 1112 (¶ 9) (Miss.Ct.App.2012) (quoting Goellner v. Goellner, 11 So.3d 1251, 1264 (¶ 45) (Miss.Ct.App.2009)). We will not disturb a chancellor’s factual findings unless they are “manifestly wrong [or] clearly erroneous, or the chancellor applied an improper legal standard.” Id.

1. The Non-Realty Marital Property

¶26. The chancellor divvied up the marital property, awarding Courtney his 401(k), the BMW and Honda, two televisions, two bedroom suites, and the entertainment center. And as mentioned, Courtney also kept his separate property in West Point. Linda was awarded her 401(k), the Nissan and Dodge, two televisions, two bedroom suites, the mower, and the Starkville home. She was also ordered to pay the debt on the mower and mortgage on the Starkville home.

2. The Starkville Home

¶ 27. Courtney insists he was entitled to ownership or some cut of the Starkville home, but the chancellor disagreed.
¶ 28. The chancellor found Linda had contributed much more to the Starkville home, citing Courtney’s gambling and periods of unemployment. She also recognized that at the time of trial, both were employed, but Linda had more job stability. And while Linda did have greater savings than Courtney, there was no great disparity in their incomes.
¶29. The mortgage-payment history was also considered, as were the financial contributions to the construction of the house. Because of Courtney’s poor credit history, the mortgage was solely in Linda’s name. Still, the chancellor recognized Courtney had made monthly mortgage payments of $1,436 for twelve months, half the payments for six months, and interest payments of $1,425. But Linda had paid the other half of the Starkville home’s mortgage payments for these six months. And she had made all mortgage payments from February 2011 to the time of the trial. The chancellor also emphasized that Linda had put $16,000 from her inheritance, $6,800 from her 401 (k), a $2,900 cash advance from her credit card, and $5,000 in personal funds into the construction of the Starkville home. See Berryman v. Berryman, 907 So.2d 944, 947 (¶ 13) (Miss.2005) (finding no error in awarding the wife sole ownership of the marital residence where she made substantial financial contributions to the acquisition of the residence). So the chan *45 cellor rightly found Linda had contributed more financially to the acquisition, purchase, and construction of the Starkville home.
¶ 30. Linda also took care of the home and family, while Courtney shouldered the blame for the instability of the home and ultimate dissolution of the marriage. And Linda had strong emotional ties to the Starkville house since a friend of her deceased father built it.
¶ 31. Under the nonmarital-assets factor, the chancellor mentioned “Courtney owns [a] one-half interest in real property in Clay County in which there is equity of approximately $34,000.00.” It was not lost on the chancellor that Linda had assisted Courtney financially “when his separate real estate in Clay County was in foreclosure.”
¶ 32. After review, we find the chancellor equitably distributed the marital assets, including the Starkville house. That Courtney was not awarded the Starkville home or some of its equity does not mean the division was inequitable. Indeed, we are mindful that “an equitable division of property does not necessarily mean an equal division of property.” Carter, 98 So.3d at 1113 (¶ 11). If Ferguson is properly applied, equitable divisions may at times be somewhat lopsided. Id. at (¶ 12).
¶ 33. Here, the division of assets was fairly equal, even though equal division is not required. See id. at (¶ 11). We find the chancellor properly applied Ferguson and see no error in the equitable distribution. We affirm.
¶ 34. THE JUDGMENT OF THE OK-TIBBEHA COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, FAIR AND JAMES, JJ., CONCUR.

. Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994).

.Linda did not file an appellee’s brief. While traditionally the "failure to file a brief is tantamount to a confession of error, there is an exception when this court can 'state with conviction after reviewing the record and brief of the appealing party that no error existed.' ” Gary v. Gary, 84 So.3d 836, 838-39 (¶ 11) (Miss.Ct.App.2012) (quoting Conservator of Eldridge v. Sparkman, 813 So.2d 753, 755 (¶ 7) (Miss.Ct.App.2001)). After a review of the record, we find that there is a "sound and unmistakable basis or ground upon which the judgment may be safely affirmed.” Pruitt v. Payne, 14 So.3d 806, 810 (¶ 6) (Miss.Ct.App.2009).

. Courtney resided in the West Point home for approximately twenty years with his first wife before Linda moved in.

. Courtney was found guilty of these charges before the final judgment in the case before us was entered.

. For example, corroboration may be unnecessary in unusual cases, such as isolation. Jones v. Jones, 43 So.3d 465, 478 (¶ 30) (Miss.Ct.App.2009). Further, " 'the corroborating evidence need not be sufficient in itself to establish the ground,' but rather 'need only provide enough supporting facts for a court to conclude that the plaintiff's testimony is true.’ ” Id. (quoting Deborah H. Bell, Bell on Mississippi Family Law § 4.02[8][d] at 74 (2005)).

.The chancellor’s final judgment classified the West Point home as Courtney’s separate property. The final judgment of divorce says that “[pjrior to the marriage, Courtney owned a residence in West Point, MS. Once married, Linda moved into the West Point residence with Courtney.... The parties lived in this home from 2007 to 2009. [Then] Courtney leased the West Point residence to his niece.” Later in the judgment, the chancellor noted "Linda assisted Courtney monetary [sic] when his separate real estate in Clay County was in foreclosure.” (Emphasis added). And she further found that "Courtney owns [a ] one-half interest in real property in Clay County in which there is equity of approximately $34,000.00." (Emphasis added). This finding was made under the Ferguson factor titled "the value of assets not ordinarily subject to distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse.” Linda does not argue that the chancellor erred in classifying the West Point home as nonmarital property since the parties lived in the home together for two years after they married. Courtney testified he wanted the West Point home, and Linda testified that she wanted Courtney to have the West Point home.

. On the other hand, Linda testified that her name was on the deed to the West Point house.

. See Morris v. Morris, 5 So.3d 476, 492 (¶ 38) (Miss.Ct.App.2008) (The fact that property was titled in the husband’s name was irrelevant because "title is no longer determinative in deciding a party’s rights to the property.”); Carrow v. Carrow, 642 So.2d 901, 906 (Miss.1994) (Chancellors must "look behind the formal state of title” in making an equitable division.).

. Those eight factors are:
1. Substantial contribution to the accumulation of the propertyf, such as:] ... a. Direct or indirect economic contribution to the acquisition of the property; b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties[,] and duration of the marriage; and c. Contribution to the education, training^] or other accomplishment bearing on the earning power of the spouse accumulating the assets[;] 2. The degree to which each spouse has expended, withdrawn[,] or otherwise disposed of marital *44 assets and any prior distribution of such assets by agreement, decreeL] or otherwise[;] 3. The market value and the emotional value of the assets subject to distribution!;] 4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse; 5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution; 6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties; 7. The needs of the parties for financial security with due regard to the combination of assets, income!,] and earning capacity; and, 8. Any other factor which in equity should be considered.
Gillespie v. Gillespie, 106 So.3d 869, 874 (¶ 23) (Miss.Ct.App.2013) (quoting Ferguson, 639 So.2d at 928).