## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CP-00200-COA

**PERRY EDWARD LITTLEFIELD**                                                        **APPELLANT**

**v.**

**BROOKE DIXON LITTLEFIELD**                                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/05/2018 |
| TRIAL JUDGE: | HON. H.J. DAVIDSON JR. |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | PERRY EDWARD LITTLEFIELD (PRO SE) |
| ATTORNEYS FOR APPELLEE: | JAMES ROGER FRANKS JR. WILLIAM RUFUS WHEELER JR. TIFFANY KAIL PHARR |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 08/27/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE BARNES, C.J., TINDELL AND McCARTY, JJ.

### TINDELL, J., FOR THE COURT:

¶1. Perry Edward "Eddie" Littlefield appeals the opinion and final judgment of the Lafayette County Chancery Court entered on February 5, 2018, which granted a divorce in favor of Brooke Dixon Littlefield on the ground of habitual cruel and inhuman treatment. Eddie also challenges the chancellor's equitable division of the couple's marital property following Brooke's waiver of certain rights to marital property and the chancellor's dismissal of his counterclaim with prejudice. Finding no error, we affirm the chancellor's judgment of divorce and division of the property. We also affirm the chancellor's dismissal of Eddie's counterclaim with prejudice.

## FACTS

¶2.    Eddie and Brooke were married in Lafayette County, Mississippi on May 3, 2012, until their separation on or about May 11 or 12, 2017.  The couple had no children from the marriage and very little personal property to divide.  On May 18, 2017, Brooke filed her complaint for divorce on the ground of habitual cruel and inhuman treatment or, in the alternative, for irreconcilable differences, and Eddie filed his answer and counterclaim for divorce on the ground of adultery.  The parties filed an agreed scheduling order, setting deadlines for all dispositive and pre-trial motions and setting the divorce trial for November 13, 2017.  On November 9, 2017, four days before trial, Eddie filed a motion to amend his counterclaim, requesting that the chancellor dismiss his claim for divorce on the ground of adultery.  The chancellor denied this motion as untimely.

¶3.    Divorce proceedings occurred on November 13, 2017, and January 8, 2018.  The chancellor heard testimony from several witnesses, including Eddie, Brooke, and Brooke's mother, Jean Dixon, and was provided with text messages exchanged between Eddie and Brooke.  On February 5, 2018, the chancellor entered his opinion and final judgment, finding Brooke's testimony to be credible and sufficiently corroborated by other evidence. The chancellor also noted Eddie's extremely disruptive and antagonistic behavior during the divorce proceedings.  In his opinion and final judgment, the chancellor granted a divorce in favor of Brooke on the ground of habitual cruel and inhuman treatment and dismissed Eddie's counterclaim for divorce based upon adultery with prejudice.

¶4.    The chancellor also found that the parties acquired most of their debts and personal

property during the marriage. Because Brooke waived her right to most of the marital and disputed property, the chancellor awarded this property to Eddie. Brooke was awarded all remaining property, including a 2007 Infiniti, while Eddie was awarded the couple's Nissan Xterra. The chancellor also denied Eddie's request for alimony and for Brooke to bear responsibility for the remainder of his student loans. Aggrieved by this judgment, Eddie now timely appeals.

## STANDARD OF REVIEW

¶5. We apply a limited standard of review when examining a chancellor's decision in domestic-relations matters. *Williams v. Williams*, 224 So. 3d 1282, 1284 (¶5) (Miss. Ct. App. 2017). "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic-relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Henderson v. Henderson*, 757 So. 2d 285, 289 (¶19) (Miss. 2000). We review the facts of a divorce decree "in a light most favorable to the appellee," and unless the chancellor's judgment was manifestly wrong, clearly erroneous, or based on an erroneous legal standard, the judgment should stand. *Fisher v. Fisher*, 771 So. 2d 364, 367 (¶8) (Miss. 2000).

¶6. When reviewing chancellor's judgment of property division, we are required "to ensure that the chancellor followed the appropriate standards and did not abuse his discretion." *Wells v. Wells*, 800 So. 2d 1239, 1243 (¶8) (Miss. Ct. App. 2001). We also review the chancellor's decision to deny Eddie's motion to amend his counterclaim for abuse of discretion. *Hutzel v. City of Jackson*, 33 So. 3d 1116, 1119 (¶10) (Miss. 2010).

3

## ANALYSIS

¶7. In his brief, Eddie raises nine separate issues. The first six issues all relate to the chancellor's factual findings and decision to grant a divorce in favor of Brooke on the ground of habitual cruel and inhuman treatment. Eddie's seventh and eighth issues relate to the chancellor's division of the couple's property, and the remaining issue concerns the dismissal of Eddie's counterclaim with prejudice as opposed to dismissing the claim *without* prejudice. Because Eddie's issues can be separated into the foregoing three groups, we consolidate the issues and analyze them accordingly.

## I. HABITUAL CRUEL AND INHUMAN TREATMENT

¶8. Eddie first argues that the chancellor erred in granting a divorce in favor of Brooke on the ground of habitual cruel and inhuman treatment. Mississippi Code Annotated section 93-5-1 (Rev. 2018) allows a chancellor to grant a divorce based upon habitual cruel and inhuman treatment. Divorce is properly granted upon this ground if the claimant establishes, by a preponderance of the evidence, conduct that either:

> (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger and renders the relationship unsafe for the party seeking relief, or

> (2) is so unnatural and infamous as to render the marriage revolting to the non-offending spouse, making it impossible to carry out the duties of the marriage, therefore destroying the basis for its continuance.

*Alexander v. Alexander*, 95 So. 3d 696, 699 (¶9) (Miss. Ct. App. 2012) (citing N. Shelton Hand, *Mississippi Divorce, Alimony and Child Custody* § 4:12 (2d ed. Supp. 1991)). In addition, there must be a causal connection between the treatment and the actual or threatened harm to the claimant's health or well-being. *Bias v. Bias*, 493 So. 2d 342, 345

4

(Miss. 1986); *see also Faries v. Faries*, 607 So. 2d 1204, 1209 (Miss. 1992); *Farris v. Farris*, 202 So. 3d 223, 232 (¶33) (Miss. Ct. App. 2016). To establish such a causal connection, there must be some corroboration to the moving party's testimony of the offensive conduct, except in cases of isolation. *Jones v. Jones*, 43 So. 3d 465, 478 (¶30) (Miss. Ct. App. 2009). Evidence of something more than "mere unkindness, rudeness, petty indignities, frivolous quarrels, incompatibility or lack of affection" is required to establish habitual cruel and inhuman treatment. *Id*. at 469 (¶9).

¶9.     Eddie primarily argues that a lack of evidence and corroborating testimony existed to prove habitual cruel and inhuman treatment at trial. During the two-day divorce proceedings, the chancellor's main source of evidence came by way of Brooke's sworn testimony. Brooke testified that during their marriage Eddie maintained strict control over her at all times, which placed her under extreme stress on a day-to-day basis. Eddie screamed at her, both in private and in public, calling her "stupid" and "inadequate," especially when she challenged him during an argument. She described her arguments with Eddie as ones where she was constantly "on trial" with Eddie, a law student, acting as both "the judge and the jury." According to Brooke, when she disagreed with Eddie, he would often "flip out" or "fly off the handle," becoming "very angry very quickly." Brooke explained that Eddie would escalate arguments in such a way that she would never have time to think about the argument and, if she did not adequately "plead her case" to Eddie, she would "never win."

¶10.    Brooke also described the harsh nature by which Eddie approached their sexual relationship. Throughout their five-year marriage, Brooke testified that she would often

5

work 10 to 12-hour shifts as the manager of a Pet Smart in Oxford, Mississippi. During this time, Eddie primarily attended law school while she worked. When Brooke returned home from work, Eddie would demand sexual intimacy of her every day. If Brooke was tired, Eddie would become angry and aggressive with Brooke, and then go into another room to watch pornography and masturbate while she was in the house. When Brooke attempted to discuss the issue with Eddie, he would again yell and argue with her, making her feel "inadequate" and "powerless" to mend their sexual relationship.

¶11. Brooke testified that in the weeks surrounding the couple's separation there were several instances where she feared for her safety and for Eddie's own safety due to his erratic and sometimes violent behavior. The first instance occurred before the separation. Brooke testified that she and Eddie were arguing when Eddie became extremely irrational and emotional. Eddie then took a chair to the couple's backyard and sat alone in the backyard, crying and repeatedly stating that he "was ready to go to heaven" or "wanted to go to heaven." Brooke testified that she went out to the backyard to try and calm Eddie down because his behavior made her "scared that he was going to do something to himself." Brooke also knew that Eddie had many weapons in their home, including an AK-47 and an AR-15. She eventually called the couple's friend Leslie, who sent David Erhart, a church friend and ATF agent, over to their house. Erhart also testified during the divorce proceedings. Erhart stated that, after receiving the call from Leslie, he called and spoke with Brooke, who expressed concern that Eddie was suicidal. Erhart came to the house and saw Eddie sitting out in the backyard. Erhart told the chancellor that he took all of the firearms

6

from the couple's home that day to alleviate any concerns of potential harm. Also, text messages from the following day showed that Brooke was concerned about Eddie's well-being, stating that "last night was scary." Eddie confirmed the incident at trial but denied being suicidal that day.

¶12. In another instance after the separation, Eddie threatened to stop taking care of all the couple's pets and to set all of the pets loose in the couple's yard, an act that Eddie testified would show Brooke "just what she was leaving." Brooke then requested to use the couple's home computer, and Eddie initially agreed. But when Brooke came to the couple's former home, where Eddie still resided, she found that Eddie had completely smashed the computer's hard drive, rendering it unusable. Brooke also found that Eddie had set several of her pets out on the front porch in an effort to upset her. Eddie corroborated this incident at trial.

¶13. In a separate incident, Brooke testified that she went over to their former home to collect some of her belongings. When Brooke attempted to leave with a blender, Eddie became angry and physically prevented her from passing through the doorways in the house. Eddie then grabbed Brooke and pushed her, causing her to crash into a cat cage. Brooke further testified that Eddie grabbed Brooke's keys from her hand and threw them out into the backyard. When Brooke followed him, Eddie grabbed her again and attempted to take her car keys to prevent her from leaving. Brooke and her mother, Jean, testified that, after that incident, Brooke was so frightened that they both called the police.

¶14. Brooke also testified that she moved into a new apartment within the week following

7

their separation but did not tell Eddie her new address. She testified that one night, at 10:30 p.m., Eddie appeared at her residence and texted the words "knock knock." Eddie left some time after the text, but Brooke immediately called the police. Brooke testified that she did so out of fear because Eddie located her new residence and then showed up unexpectedly to her apartment at such a late hour. Eddie also confirmed this incident but stated that he came by at such a late hour to drop off a pet.

¶15. Brooke and her mother, Jean, both testified at trial that Eddie controlled the type of relationship Brooke had with her mother. Jean testified that Eddie often called both Brooke and her "stupid" any time they disagreed with him and stated that Eddie "had no use for" anyone who argued against him. Jean described Eddie's behavior as both controlling and unpredictable, stating that she was concerned for Brooke's safety during the marriage and after the separation. Eddie often made Jean uncomfortable to call Brooke on the phone, so their phone calls became less frequent to prevent from upsetting Eddie. Jean described an incident when the couple came to visit her in Georgia. Brooke and Jean tried to spend some time together shopping, but Eddie called Brooke constantly. Eddie yelled at Brooke, demanding that she end the trip and bring him food. Then, when Brooke brought Eddie pizza instead of Chinese food, he became very upset and accused Brooke and Jean of "undermining his authority." Jean further testified that Eddie's treatment of Brooke changed Brooke's personality drastically, causing her to transform from an outgoing, bubbly person into a person that Jean did not recognize.

¶16. Eddie also used religion to manipulate Brooke and control their relationship. Both

Brooke and Eddie testified that religion was very important in their lives. As the chancellor found, however, Eddie "would often use Bible scripture as a form of verbal intimidation to point out that [Brooke] had religious shortcomings and that her heart was not in the right place." Eddie used religion to control the way Brooke dressed, often berating her at home and at church if he did not approve of her clothing. When Brooke discussed having children with Eddie, he attacked Brooke's salvation, claiming that "something was wrong with her." Brooke and Jean testified that Eddie asserted his role as "head of household," holding Brooke to a higher moral standard than himself. Eddie screamed and cursed at Brooke but would get upset any time Brooke cursed.

¶17.    Brooke also provided the chancellor with a litany of disturbing text messages where Eddie attempted to demonize Brooke and attack her faith. Eddie's messages began by telling Brooke that she was going to hell because of her "small brain" and "cold heart," followed by a slew of proselytizing statements. Brooke testified that Eddie would send messages like these whenever they argued to make her feel like "a terrible person." Eddie also accused Brooke of adultery at the time of their separation and during trial, an allegation that remained unsubstantiated throughout the divorce proceedings. Jean told the chancellor that Eddie sent her text messages with videos stating "here is your adulterous daughter." Eddie admitted to calling Brooke a "whore" on several occasions and telling Brooke's co-workers and church friends that she committed adultery. Eddie also admitted to instigating conversations with several of Brooke's Chinese ESL ("English as a Second Language") students about her alleged infidelity, and then sending her the text conversations as a form of harassment.

9

¶18. Eddie asserts that Brooke's testimony lacked corroborating evidence. But the testimony of Jean, Erhart, and Eddie himself corroborated the vast majority of Brooke's allegations. We have held that a claimant's corroborating evidence "need not be sufficient in itself to establish the ground, but rather, need only provide enough supporting facts for a court to conclude the [claimant's] testimony is true." *Williams v. Williams*, 224 So. 3d 1282, 1287 (¶15) (Miss. Ct. App. 2017). In this case, the chancellor was provided more than enough testimony and evidence to corroborate Brooke's testimony.

¶19. Eddie also argues that the evidence provided at trial was insufficient to prove habitual cruel and inhuman treatment by a preponderance of the evidence. As the trier of fact, the chancellor "evaluates the sufficiency of proof based on the credibility of the witnesses and the weight of their testimony." *Rawson v. Buta*, 609 So. 2d 426, 431 (Miss. 1992). Divorces based upon habitual cruel and inhuman treatment are necessarily fact-intensive and require a case-by-case analysis. James Shelson, *Mississippi Chancery Practice* § 38:5 (2019). The chancellor must dually focus on both the alleged conduct of the offending spouse as well as the impact of that conduct on the complaining spouse and the marriage. *Heimert v. Heimert*, 101 So. 3d 181, 184 (¶8) (Miss. Ct. App. 2012). Upon review, we "must employ a subjective standard," rather than an ordinary, reasonable person standard, understanding that the impact of the conduct on the complaining spouse is crucial. *Harmon v. Harmon*, 141 So. 3d 37, 42 (¶16) (Miss. Ct. App. 2014) (citing *Faries v. Faries*, 607 So. 2d 1204, 1209 (Miss. 1992)).

¶20. Eddie correctly argues that a more extreme set of facts is required than a showing of "mere unkindness, rudeness, and incompatibility." *Reed v. Reed*, 839 So. 2d 565, 570 (¶19) (Miss. Ct. App. 2003). But "our supreme court has specifically noted that '[t]here are many

10

kinds of acts such as wilful failure to support, verbal abuse, neglect, and the like which, if taken alone will not constitute cruelty, but when taken together will manifest a course of conduct as a whole which may amount to cruelty.'" *Rakestraw v. Rakestraw*, 717 So. 2d 1284, 1288 (Miss. Ct. App. 1998) (citing *Savell v. Savell*, 240 So.2d 628, 629 (Miss.1970)). Also, abusive conduct that is routine and continuous suffices to meet the requisite burden. *Lomax v. Lomax*, 172 So. 3d 1258, 1261 (¶6) (Miss. Ct. App. 2016); *see also Burnett v. Burnett*, 271 So. 2d 90, 92 (Miss. 1972) (The "conduct must be habitual, that is, done so often, or continued so long, that its recurrence may be reasonably expected whenever occasion or opportunity present itself."). For example, in *Harmon*, the offending spouse's conduct included continuous sexual degradation, cursing and yelling, jealousy and constant accusations of infidelity, irrationality, and habitual name-calling. *Harmon*, 141 So. 3d. at 40 (¶¶5-11). Because the cumulative effect of the offending spouse's behavior constituted cruelty, we upheld the chancellor's judgment of divorce. *Id*. at 42 (¶17).

¶21. Here, the chancellor found that the evidence and testimony provided at trial, including Eddie's own testimony and behavior, demonstrated sufficient proof to grant a divorce based upon habitual cruel and inhuman treatment. Brooke testified extensively about the effects of Eddie's behavior on her relationship with others, including her mother, and on her mental health. Jean corroborated this testimony by describing the five-year transformation in her daughter from a bubbly, outgoing person to an emotionally withdrawn and depressed individual. The chancellor even included observations in his opinion of how the parties' patterns of behavior carried over into his courtroom, with Eddie becoming increasingly aggressive and antagonistic during trial and Brooke becoming more frightened and

11

withdrawn. The chancellor did not clearly err by finding that Eddie's pattern of behavior, taken as a whole, constitutes habitual cruel and inhuman treatment. Being mindful of our limited standard of review, we find that substantial evidence supports the chancellor's judgment of divorce on this ground.

## II. EQUITABLE DISTRIBUTION

¶22. Eddie's next assignment of error relates to the chancellor's equitable distribution of the couple's property. Specifically, Eddie takes issue with: (1) the chancellor's distribution of property without classifying marital and non-marital property, and (2) the chancellor's award of the 2007 Infiniti G35 to Brooke.

¶23. After hearing testimony from both parties, the chancellor found that the couple acquired very limited personal property and that they equally contributed to the marriage. Brooke agreed on the record to waive her right to all property acquired prior to the marriage and any property rights that might be in question, with the exception of seven household items. Because of this waiver and the chancellor's finding that most of the couple's property was accumulated during the marriage, the chancellor found it unnecessary to classify the disputed items as marital or non-marital property. Eddie was awarded all waived personal property and property in question. The chancellor awarded Brooke the seven requested household items, as well as several electronic items. Also, both parties were to assume the responsibility of their individual student loan debts.

¶24. Eddie correctly asserts that, when dividing the property of a divorcing couple, the chancellor first classifies whether certain assets and liabilities were acquired by the husband, by the wife, or during the marriage. *Foreman v. Foreman*, 223 So. 3d 178, 182 (¶9) (Miss.

12

Ct. App. 2017). "However, a failure to classify property does not automatically result in reversible error if the division of property is fair." *Id.* (citing *Branch v. Branch*, 174 So. 3d 932, 944 (¶45) (Miss. Ct. App. 2015). Because of the couple's limited personal property and Brooke's agreed waiver of all disputed property, the chancellor found the necessity of determining marital and non-marital property to be moot. Eddie was ultimately awarded all of his own personal property, as well as all of the disputed property. The chancellor's distribution of property in this manner is certainly not an abuse of discretion, and as such, this argument is without merit.

¶25. Eddie also takes issue with the chancellor's award of the 2007 Infiniti G35 to Brooke. At trial, both Eddie and Brooke testified that they purchased the Infiniti to replace Brooke's Honda, which was totaled in an automobile accident. Brooke primarily drove the Infiniti and made all payments on the vehicle both during the marriage and after the separation. Eddie now argues that, because Brooke made the majority of the payments on the Infiniti out of the couple's joint bank account, the chancellor erred by awarding Brooke "the most expensive asset owned by the parties."

¶26. "The goals of equitable distribution are fair division of marital property based on the facts of each case and termination of the legal relationship in a manner which each party may realize self-sufficiency." *Seymour v. Seymour*, 960 So. 2d 513, 519 (¶15) (Miss. Ct. App. 2006). As the chancellor stated, "the bulk of the original purchase price" of the Infiniti came from the settlement funds received from the loss of Brooke's Honda. Further, the fact that Brooke made the majority of the payments from the couple's joint checking account is immaterial. Eddie and Brooke both testified that, during their five-year marriage, Brooke

provided the primary source of income while Eddie was in law school. Brooke also testified that she continued to make payments on the Infiniti after the couple separated. Finally, in addition to the Infiniti, the couple owned a Nissan Xterra, which the chancellor awarded to Eddie. Because "fairness is the prevailing guide" in the division of marital assets, the chancellor was within his discretion to award the Infiniti to Brooke. *Ferguson v. Ferguson*, 639 So. 2d 921, 929 (Miss. 1994). As such, we affirm the chancellor's division of property.

### III. DISMISSAL OF COUNTERCLAIM WITH PREJUDICE

¶27. Finally, Eddie takes issue with the chancellor's denial of his motion to amend counterclaim and the chancellor's dismissal of the counterclaim with prejudice in his final judgment, as opposed to *without* prejudice. Eddie filed his answer to the complaint on June 8, 2017, along with a counterclaim for divorce based upon adultery, among other claims. On August 1, 2017, the parties entered an agreed scheduling order, setting the deadline for motions to be filed by September 29, 2017, and for divorce proceedings to be held on November 13, 2017. On November 9, 2017, four days before trial, Eddie filed a motion to amend to withdraw his claim for a fault-based divorce following a telephonic conference with the chancellor. The chancellor denied his motion the following day.

¶28. In his brief, Eddie attempts to piece together an argument that the chancellor conspired against him by denying this amendment and forcing him into a divorce against his will. However, there is no absolute right to amend pleadings, and the denial of such a request to amend is within the sound discretion of the chancellor. *Hartford Cas. Ins. Co. v. Halliburton Co.*, 826 So. 2d 1206, 1219 (¶46) (Miss. 2001). As the chancellor stated at the outset of the proceedings, the motion was filed on the eve of trial and thereby denied as

14

untimely. Further, where the amendment would still render the claim futile, the chancellor is well within his discretion to deny such request. *Id*. After the two-day trial, the chancellor found that Brooke had met her burden of proof for habitual cruel and inhuman treatment and granted her a divorce upon that ground. This judgment thereby rendered Eddie's claim futile. Also, at that point, Eddie had requested that his counterclaim for fault-based divorce be dismissed and likewise offered no proof on the matter. Accordingly, the chancellor dismissed Eddie's counterclaim for divorce based upon adultery with prejudice as a part of his full and final judgment. Keeping in mind the chancellor's evidentiary role in these matters, we find that the chancellor was well within his discretion in dismissing Eddie's counterclaim for divorce with prejudice.

## CONCLUSION

¶29.    Upon weighing all the evidence, the chancellor found Brooke's testimony and evidence of habitual cruel and inhuman treatment to be both credible and sufficiently corroborated. The chancellor therefore granted Brooke a divorce based upon this ground. Because substantial evidence supports this decision, we affirm the chancellor's final of judgment of divorce in favor of Brooke.

¶30.    We also affirm the chancellor's equitable distribution of the couple's property. The chancellor found that the couple acquired most of their very limited property during the marriage and that Brooke waived her right to claim any of the disputed property. As such, the chancellor found it unnecessary to classify marital and non-marital property and awarded Eddie the majority of the waived property. Because the chancellor's findings support this decision to forgo classification, we find no error here. We also affirm the chancellor's

15

decision to award the couple's 2007 Infiniti to Brooke. Eddie and Brooke purchased the Infiniti to replace Brooke's totaled Honda, and Brooke assumed responsibility for the car payments before and after their separation. We affirm the chancellor's equitable distribution of the couple's property.

¶31. Finally, the chancellor denied Eddie's untimely motion to amend to withdraw his counterclaim of divorce, which was well within his discretion. After a full trial on the merits, the chancellor granted a divorce in favor of Brooke, and such decision constituted a full and final judgment. Because we affirm the chancellor's judgment of divorce, we likewise find any claim for divorce that Eddie may have in the future to be futile. We therefore affirm the chancellor's dismissal of Eddie's counterclaim with prejudice.

¶32. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**