# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00370-COA

BRUCE D. LINDSAY                                                    APPELLANT

v.

PAULA E. LINDSAY AND CHRISTY                                        APPELLEES
PICKERING, CPA

DATE OF JUDGMENT:            11/17/2017
TRIAL JUDGE:                 HON. MICHAEL H. WARD
COURT FROM WHICH APPEALED:   HARRISON COUNTY CHANCERY COURT,
                             FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      REED STANTON BENNETT
ATTORNEYS FOR APPELLEES:     TIMOTHY LEE MURR
                             THOMAS WRIGHT TEEL
                             RUSSELL SCOTT MANNING
                             NICHOLAS VAN WISER
NATURE OF THE CASE:          CIVIL - DOMESTIC RELATIONS
DISPOSITION:                 REVERSED, VACATED IN PART, AND
                             REMANDED - 04/07/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE J. WILSON, P.J., GREENLEE AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     This acrimonious divorce case involves Bruce Lindsay and Paula Lindsay. In 2014,

Paula filed her complaint for divorce on the ground of habitual cruel and inhuman treatment,

and Bruce filed an answer along with a motion for temporary relief. On June 13, 2014, the

court held a temporary-relief hearing, where the chancellor issued a bench ruling ordering

both parties to "keep everything status quo." But a written order was not entered until

October 3, 2016. It was that ruling that later resulted in Bruce being held in contempt on

October 19, 2017, and ordered to be incarcerated until he "purged" himself of that contempt.

¶2.     On November 1, 2017, the court held a hearing on Bruce's contempt, and Bruce was transported from jail to the hearing. During that hearing, Bruce agreed to the terms of a property settlement agreement as part of the divorce. Paula also testified as to Bruce's habitual cruel and inhuman treatment. At the close of the hearing, the court granted Paula's request for a divorce on the ground of habitual cruel and inhuman treatment and incorporated the parties' stipulated property settlement agreement. The court further ordered Bruce to pay all of Paula's attorney's fees and the court-appointed certified public accountant (CPA) Christy Pickering's expert fees and her attorney fees.[1]

¶3.     On appeal, Bruce raises six issues. Because we find four of those issues to be dispositive, we limit our discussion to the following: (1) whether the contempt order was too vague to enforce; (2) whether there was sufficient proof for the chancellor to grant a divorce judgment on the ground of habitual cruel and inhuman treatment; (3) whether the court erred in ordering Bruce to pay Pickering's full expert fees and her attorney's fees; and (4) whether the court erred in ordering Bruce to pay Paula's attorney's fees. After review, we reverse the chancery court's contempt order and divorce judgment, set aside the property settlement

---

[1] Although Bruce agreed to pay Paula's attorney's fees and Pickering's expert fees and attorney's fees, the exact amount of those fees were not known at the November 1, 2017 hearing. Paula's attorney's fees were determined in the November 17, 2017 divorce judgment, and Pickering's expert fees and attorney's fees were specified later in an order dated February 16, 2018. Bruce now claims in this appeal that he was under duress when he made the agreement to pay those fees.

2

agreement, reverse the chancery court's order that Bruce pay all the court-appointed expert's fees and attorney's fees and Paula's attorney's fees, and remand this case to the chancery court further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶4.     Bruce and Paula married in 2000.  They have one child together, who was born in 2001.  On January 3, 2014, Bruce and Paula separated.  Paula filed her complaint for divorce on January 22, 2014, on the ground of habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences.  Shortly thereafter, Bruce filed his answer to the complaint for divorce and at the same time filed a motion for temporary relief.  On April 25, 2014, Bruce propounded numerous requests for admissions to Paula.  Paula did not respond to those requests until October 4, 2016, and only then in an effort to defeat a motion for summary judgment that Bruce had filed.

¶5.     On June 13, 2014, Judge Sandy Steckler presided over a hearing on the issue of temporary relief.[2]  Both parties sought both the use and possession of the marital home and custody of the minor child.[3]  Numerous exhibits were introduced at the hearing, including Paula's Rule 8.05 financial statement,[4] Paula's tax information from 2010, 2011, and 2012,

---

[2] The case was originally assigned to Judge Jim Persons, who recused on April 7, 2014.  The case was then reassigned to Judge Jennifer Schloegel.  Judge Schloegel recused on April 16, 2014, and the case was reassigned to Judge Steckler.

[3] The day before the hearing, Judge Steckler heard testimony from the child in his chambers.

[4] Uniform Chancery Court Rule 8.05.

3

and Bruce's Rule 8.05 financial statement. Paula's Rule 8.05 financial statement disclosed that her total monthly income was $0.[5] She testified that she was wholly dependent on Bruce for financial support. Paula also testified that she was the child's primary care giver. Bruce's Rule 8.05 financial statement disclosed that his total gross monthly income was $12,563.09. But his net income was $10,260. Further, Bruce's Rule 8.05 financial statement showed that he was responsible for nearly all of the couple's expenses, namely the mortgage, home maintenance, utility bills, groceries, household expenses, and child expenses. Bruce listed his total monthly expenses as $14,783.82. Bruce testified that he served as the president of Coast Management Systems LLC, a management company for various trucking companies. At the close of the hearing, Judge Steckler issued a bench ruling, ordering that Paula have temporary sole custody of the minor child and temporary use and possession of the marital home.[6] Judge Steckler further stated that Bruce was "to continue paying everything that he's paying now. I want him to keep everything status quo." Despite the bench ruling, no written temporary order was ever entered. A new judge took over the case, and, on October 3, 2016, he entered a written temporary order.

¶6. On October 9, 2014, the court entered an order appointing CPA Christy Pickering as the court's expert. The court appointed Pickering to investigate "the various companies and

---

[5] Paula was the director and owner of the Pass Christian Soap Company. She testified that the company did not generate any profits.

[6] Bruce was allowed to remain in the marital home for one week to allow him time to make alternative living arrangements.

trust that the husband has some interest in and also the soap company and the film company that the wife has some interest in [and] determine the value of the companies and the parties' interest in those companies for court purposes in a divorce." The court explained that "both parties believe the other party is making more money than reported; therefore, the Court directs that both parties' financial information about the companies should be transparent and forthright through discovery and through the work of the forensic expert."

¶7. On January 26, 2015, Pickering sent letters to Bruce's attorney requesting documentation from twelve companies in which he held an alleged financial interest. Between May 11, 2015 and May 21, 2015, twenty-four subpoenas duces tecum were issued to the respective companies, requesting specific financial documents. On May 29, 2015, attorney Michael Holleman filed a special appearance, motion to quash and for a protective order, and other relief on behalf of all twelve companies. The companies denied that Bruce held any financial interest in two of the companies and also claimed that Pickering had exhibited bias against Bruce and the companies and that her investigation had been tainted by the use of "illegally obtained data" from Paula's attorney. On June 10, 2015, Pickering sent a letter to Judge Steckler denying the allegations set forth in the companies' motion. Pickering also hired an attorney to defend her against those allegations.

¶8. On July 15 and July 16, 2015, the court held a hearing on the motion to quash and heard partial testimony from both sides. Thereafter, the court determined that Bruce "serve[d] as president of the nineteen to twenty businesses, both limited liability companies

5

(LLCs) and corporations." The court further determined that Bruce has a financial interest in several of the LLCs or corporations individually and that all the businesses function in a group. Ultimately, the court held in abeyance its decision on the motion to quash pending final testimony from both sides. In the meantime, the court ordered Pickering, Holleman, Bruce's attorney, and Paula's attorney to go to each business, download any and all electronic data, make copies of any physical records requested by Pickering, and take the information to the chancery clerk's office for safe storage.

¶9. On August 17, 2015, Bruce and Holleman, on behalf of the companies, filed a joint motion for recusal of Judge Steckler as a result of comments the judge made at the previous hearing. On September 10, 2015, Judge Steckler entered a sealed order and recused himself from the case and was later replaced by Judge Michael Ward. On November 16, 2015, Judge Ward held a hearing on the oral temporary order by Judge Steckler from the original temporary hearing date of June 13, 2014. Bruce's attorney sought clarification on what Bruce needed to pay to "maintain the status quo" since a temporary order had never been entered and the oral order was vague. Judge Ward questioned both attorneys as to why no order had been entered, and Paula's attorney stated that "there were objections to various things when an order was presented." The court held four other hearings between March 18, 2016, and August 23, 2016, to determine what the June 13, 2014 ruling encompassed. At the April 22, 2016 hearing, Paula testified that Bruce had stopped making payments to her the month prior.

6

¶10. Finally, more than two years after the hearing on October 3, 2016, the court entered a nunc pro tunc temporary order requiring Bruce to "continue to pay an[y] and all debts, obligations and expenses he was paying prior to June 13, 2014." Similar to Judge Steckler's bench ruling, Judge Ward's ruling did not specify any exact amounts or any of the exact obligations that Bruce was expected to pay.

¶11. The following day, October 4, 2016, Paula filed a motion for contempt against Bruce. Paula's motion for contempt alleged that Bruce violated the "temporary matter as of October 3, 2016 and made nunc pro tunc to June 13, 2014." Specifically, the motion alleged that Bruce was in arrears for $2,500 per month in child support (a total amount of $20,000) and the other expenses Bruce had stopped paying. The contempt motion alleged Bruce was in contempt for failure to pay all of the expenses listed in his Rule 8.05 financial statement at the June 13, 2014 hearing. Yet, Bruce's Rule 8.05 financial statement never listed $2,500 in monthly child support, and the court never ordered that support obligation. The words "child support" are not mentioned in the oral ruling on June 13, 2014, or the written order on October 3, 2016. This becomes vitally important in addressing the contempt order and the incarceration of Bruce for failure to pay that support.

¶12. On September 15, 2016, Bruce filed a motion for summary judgment and sanctions. Specifically, Bruce argued that Paula had failed to object or respond to the requests for admissions filed on April 25, 2014. Paula subsequently filed a response to Bruce's motion, as well as a motion requesting relief under Mississippi Rule of Civil Procedure 36(b),

7

allowing amendments to untimely admissions. The court heard the matter on October 5, 2016. The following day, the court entered an order denying Bruce's motion for summary judgment but also stated "the court finds that all requests for admissions as admitted at this time." Those "admitted" requests for admissions essentially tracked the standard for habitual cruel and inhuman treatment under Mississippi law and denied the required facts.

¶13. On April 26, 2016, the court entered an order approving Pickering's interim bill of $28,657.65. The court further ordered that each party was responsible for paying half the bill—$14,328.83—no later than May 15, 2016. Neither party complied.

¶14. On October 25, 2016, the court entered an order based on an agreement between the parties regarding Pickering's fees, which they failed to pay in compliance with the April 26, 2016 order. The order stated that Bruce agreed to pay Pickering $14,428.82 plus interest at the annual rate of five percent, and Paula agreed to pay Pickering $16,550.70 plus interest at the annual rate of five percent. Bruce and Paula also agreed to split Pickering's attorney's fees of $900.

¶15. Bruce was terminated from his job on August 12, 2015, and claimed his firing was due to the adversarial nature of the divorce proceedings and specifically alleged that Paula's "actions along with those of her attorney and the court's expert have cost Mr. Lindsay his employment."[7] On November 28, 2016, Bruce filed for bankruptcy under Chapter 7 of the

---

[7] Bruce made this allegation in his motion for temporary relief filed on September 1, 2015.

8

Bankruptcy Code, initiating an automatic stay pursuant to 11 U.S.C. § 362(a) (2012). On January 18, 2017, Paula filed a motion for relief from the automatic stay, and on February 27, 2017, the bankruptcy court entered an order granting her motion, allowing Paula to proceed in her state court proceedings with respect to the following: "(1) dissolution of marriage, (2) custody of the minor child, (3) alimony, maintenance and/or support from property that was not property of the bankruptcy estate, and (4) determination of equitable division of marital property." Furthermore, the order provided that "the automatic stay shall remain in full force and effect and this court reserves exclusive jurisdiction with respect to: (1) enforcement of a judgment in the chancery court case to the extent it affects property of the bankruptcy estate, and (2) approval and entry of any consensual property settlement agreement which affects property of the bankruptcy estate." As a result, Paula proceeded on her motion for contempt and complaint for divorce in this action.

¶16.  On March 22, 2017, Pickering filed her proof of claim in Bruce's bankruptcy proceedings for the amount Bruce owed in expert fees. On April 14, 2017, she filed an adversary proceeding in Bruce's bankruptcy action by filing a complaint objecting to dischargeability pursuant to 11 U.S.C. § 523(a)(5) and § 523(a)(15) (2012).

¶17.  The court held several hearings between May 2, 2017, and September 19, 2017. Part of those hearings involved Pickering and her repeated efforts to gain information regarding both parties' financial information, particularly Bruce's and his involvement with the previously mentioned companies. On August 24, 2017, Bruce's attorney filed a motion to

withdraw, which the court granted on September 19, 2017, at the beginning of the hearing on Paula's motion for contempt. On September 21, 2017, the court entered an order stating that since the June 13, 2014 ruling,

> Bruce was required to pay $500 per week, to pay the house note, to pay for house and pool maintenance, and to pay all utilities, all of which he was paying prior to June 13, 2014. As of the date of the hearing on the motion before the court, Bruce is found by a clear preponderance of the evidence to be in arrears some $77,657.25, comprised of $37,500 in unpaid support, $27,026.03 in house notes he has not paid, $10,500 in house and pool maintenance expenses he has not paid, and $2,631.22 in unpaid utility bills.

The court did not itemize what length of time made up the "$37,500 in unpaid support" or exactly what type of support Bruce failed to pay—child, spousal, or both. Again, Paula's motion for contempt alleged $20,000 in owed child support, but the court never indicated what previous order mandated that support or whether that was part of the $37,500 it found Bruce owed in support.[8] Ultimately, the court held Bruce in contempt in the total amount of $77,657.25. Additionally, the court ordered that Bruce pay Paula the full amount by October 19, 2017, in addition to $5,000 for her attorney's fees. The court made clear that Bruce had until October 19, 2017, to purge himself of the contempt by paying the $77,657.25, or he would be incarcerated.

¶18.    The court held a hearing on the contempt order on October 19, 2017. Bruce appeared at the hearing pro se and provided the court with an approximate income summary dated

---

[8] Neither the oral temporary order nor the written temporary order mention any amount of spousal or child support.

10

January 1, 2017, to September 30, 2017, which showed his total income as $20,516. At the

close of the hearing, the court issued the following bench ruling:

> I find that Mr. Lindsay has failed to pay the support as previously ordered by the court of the $500 per week. I count 19 weeks there through the 15th of October of 2017. That's a total of 9,500. He failed to pay house notes in the amount of $12,416, house and pool maintenance of $3,306.60, utilities of $2,590.82 for a total of 27,813.42 for which judgment is granted in favor of Ms. Lindsay. Now, I do, in addition, find that there has been no showing with any particularity by Mr. Lindsay that he can't pay at least a part of that which he is required to pay, and there has not been a copper coin paid for months, about a year now. I find that he is, by his failure to pay even this one penny in support, that he's in willful, obstinate, contumacious contempt, and now owes a total of $105,470.67. **Now, Mr. Lindsay shall stand incarcerated at the Harrison County Jail until such time as he shall pay said amount.**

(Emphasis added). That same day, the trial court entered its written order of contempt and

order for incarceration, finding that Bruce Lindsay had failed to purge his contempt or prove

his inability to pay. Bruce was placed in the county jail for his failure to pay. At the time of

that hearing, it is undisputed that Bruce had no lawyer, was no longer employed at his job,

and had a pending bankruptcy petition.

¶19.    On November 1, 2017, Bruce was transported from jail for a hearing on his contempt.

At the beginning of the hearing, Bruce stated, "I'm not able to pay the order. At this point,

I'm requesting an attorney appointed by the court, and to be released." The judge asked if

Bruce had access to the library, and he responded "no." Bruce continued, "[T]his is an

extremely complex case . . . I am asking, again, for a court-appointed attorney." The judge

explained that because the case was civil, he was "powerless" to appoint an attorney.[9] Bruce

responded, "I'm not a criminal and this has been rough and I'm in with convicted felons and,

additionally, I've gotten sick this week . . . I don't see how I can make headway without an

attorney." The court told Bruce to meet with Paula and her attorney to determine if the issues

in the divorce could be resolved. Later, after a recess, the contempt hearing was transformed

into a divorce hearing when Bruce agreed to the terms of the divorce settlement. As part of

the agreement, Bruce agreed to deed to Paula the marital home and all its belongings, pay off

the mortgage on the marital home, deed the couple's townhome to Paula and pay off the

mortgage, and then pay Paula rent if Bruce stayed there, pay $1,400 in monthly child support,

and approximately $905,470.67 in lump-sum alimony, which included the contempt amount

of $105,470.67. Bruce further agreed to pay Paula's attorney's fees to be determined later.

Finally, despite a previous order from court directing each party to each pay half of

Pickering's expert fees, Bruce agreed to pay all of Pickering's fees and attorney's fees on or

---

[9] In *Turner v. Rogers*, 564 U.S. 431, 446 (2011), the United States Supreme Court stated that the Due Process Clause of the United States Constitution does not automatically require providing counsel in certain civil proceedings where incarceration is threatened. When deciding whether or not counsel would be required, the court must take into account the opposing interests, as well as consider if "additional or substitute procedural safeguards" were present. *Id.* In *Turner*, the United States Supreme Court reversed a defendant's order of incarceration because he had no lawyer and "did not receive clear notice that his ability to pay would constitute the critical question in his civil contempt proceeding." *Id*. at 449. The Supreme Court also noted that the defendant was not provided with a form designed to elicit information about his financial circumstances, and the trial court did not specifically determine if the defendant was unable to pay his arrearage. *Id*. Despite requesting an attorney be provided, Bruce did not raise this issue on appeal.

before March 1, 2018, with the exact amount to be determined later. The court reserved ruling on the exact amount until further determination as to Pickering's expert fees. After the property settlement agreement was read into the record by Paula's attorney, Paula was called to the witness stand and provided testimony on Bruce's alleged habitual cruel and inhuman treatment. The court found the evidence sufficient and granted Paula a divorce on that ground. The court entered a written judgment of divorce on November 17, 2017.

¶20. Pickering filed her motion for assessment of fees and expenses in the chancery court on November 17, 2017, requesting a ruling on the balance Bruce owed. The court held a hearing on December 6, 2017, to determine the exact amount owed to Pickering and her attorney. On February 16, 2018, the court entered an order awarding Pickering expert fees in the amount of $39,328.48 and attorney's fees in the amount of $34,658.08, which the court found were "necessarily incurred as a proximate result of Bruce Lindsay's actions in threatening to file suit against Pickering in her capacity as court appointed expert and in resisting the efforts of Pickering to ascertain the financial condition of Bruce Lindsay." The court further ordered Bruce to pay the entire amount.

¶21. Bruce now appeals from the divorce judgment, including the provisions regarding Paula's attorney's fees and Pickering's expert fees and litigation costs.

**STANDARD OF REVIEW**

¶22. "In domestic-relation cases, our review is limited to whether the chancery court's findings were manifestly wrong or clearly erroneous, or the court applied the wrong legal

13

standard." *Gwathney v. Gwathney*, 208 So. 3d 1087, 1088 (¶5) (Miss. Ct. App. 2017). If substantial evidence in the record supports the chancellor's findings of fact, we will not disturb his decision. *Id.*

## ANALYSIS

### 1. Contempt Order

¶23. "Civil contempt orders enforce a private party's rights or compel compliance with a court's order." *Hanshaw v. Hanshaw*, 55 So. 3d 143, 147 (¶13) (Miss. 2011). "Failure to comply with a court order is prima facie evidence of contempt." *Evans v. Evans*, 75 So. 3d 1083, 1087 (¶14) (Miss. Ct. App. 2011). "Before a party may be held in contempt for failure to comply with a judgment, 'the judgment must be complete within itself[,] leaving open no matter or description or designation out of which contention may arise as to meaning.'" *Davis v. Davis*, 829 So. 2d 712, 714 (¶9) (Miss. Ct. App. 2002) (quoting *Wing v. Wing*, 549 So. 2d 944, 947 (Miss. 1989)). "A contempt citation is proper only when the contemner has wilfully and deliberately ignored the order of the court." *Lewis v. Pagel*, 172 So. 3d 162, 178 (¶39) (Miss. 2015) (quoting *Gaiennie v. McMillin*, 138 So. 3d 131, 136 (¶13) (Miss. 2014)). Further, "[t]his Court will not reverse a contempt citation where the chancellor's findings are supported by substantial credible evidence." *Witters v. Witters*, 864 So. 2d 999, 1004 (¶18) (Miss. Ct. App. 2004) (citing *Varner v. Varner*, 666 So. 2d 493, 496 (Miss. 1995)).

¶24. "A defendant may avoid a judgment of contempt by establishing that he is without the present ability to discharge his obligations. However, if the contemnor raises inability to pay

14

as a defense, the burden is on him to show this with particularity, not just in general terms."

*Varner*, 666 So. 2d at 496 (citation omitted).

¶25. Here, the trial court held Bruce in contempt of the October 13, 2016 written temporary order entered nunc pro tunc to June 13, 2014. At the June 13, 2014 hearing, the court examined Bruce's Rule 8.05 financial statement and heard testimony from both Bruce and Paula. At the close of the hearing, Judge Steckler indicated his ruling was not complete, stating, "But I want to meet again with both attorneys early next week and go over it and then we'll finish this order." He continued "[B]etween now . . . and the time that I enter another order, he is to continue to **pay everything that he's paying now**." (Emphasis added). His bench ruling made no mention of the exact amount of child support, the exact amount of spousal support, home mortgage notes, house maintenance for the pool or yard, or any other specific amount for a specific obligation that Bruce was to pay.

¶26. What Bruce was actually paying at the time of June 13, 2014 hearing is unclear from the record. His Rule 8.05 financial statement from that hearing shows he was paying over $14,000 per month in expenses despite only having $10,260.76 in net income. Further, his Rule 8.05 financial statement does not mention any amount of child support or spousal support, both of which he was later held in contempt for not paying. The vague nature of the temporary order continued with the new chancery judge's equally vague ruling—the October 3, 2016 written order—that Bruce "continue to pay an[y] and all debts, obligations and expenses he was paying prior to June 13, 2014." The specific amounts for what specific

15

obligations that Bruce was required to pay and for which he was held in contempt for not paying were not "complete within the judgment." In other words, Bruce was held in contempt and incarcerated for not paying obligations that were never specifically set forth within the four corners of the oral ruling on June 13, 2014, or the written temporary order entered by a different judge on October 3, 2016. The written order simply used similar language given by Judge Steckler from the June 13, 2014 hearing. If we looked only to the temporary orders, it would be impossible to know what exactly Bruce had been ordered to pay and in what amounts. The orders are vague and confusing. At the second contempt proceeding on October 19, 2017, before he was ordered to be incarcerated, Bruce said as much when he argued pro se to the court the following:

> My point, I guess, is that it's certainly not willful. There's a lack of money. Additionally, I think there was definitely confusion over this to this day, but there certainly was confusion through the different meetings, conferences . . . and hearings and no written order by Judge Steckler.

¶27. Simply put, the language in the oral order from the bench and the written order entered over two years later never mention any specific type of obligation or in what amount that obligation is to be paid. In fact, the words child support, spousal support, home mortgage, and lawn or pool maintenance, or any specific monetary amounts for any of those obligations, are never mentioned in either orders. At the June 13, 2014 hearing, the court simply said to "pay everything that he's paying now[,]" and the October 3, 2017 written order simply stated, "[P]ay any and . . . all debts, obligations, and expenses he was paying prior to June 13, 2014." This Court has made clear that the "judgment must be complete within

16

itself[,] . . . leaving open no matter or description or designation out of which contention may arise as to meaning." *Davis*, 829 So. 2d at 714 (¶9) (quoting *Wing*, 549 So. 2d at 947). The meaning of the oral order from the bench on June 13, 2014, and the written order trying to reduce to writing that oral order was not clear and certainly not "complete" within itself. Orders from courts, whether oral or written, should not be so vague as to prevent a reasonable person from understanding its clear legal effect or the potential for contempt in failing to abide by its terms. Those terms should be clearly defined within the four corners of the order in an effort to cause "contention [that] may arise as to meaning." *Id*. The temporary orders in this case were overly vague, ambiguous, and unclear as to exactly what was required to be paid. Therefore, the order of contempt against Bruce in the amount of $105,470.67 is hereby reversed.

**2.     Divorce Judgment**

**a.     Ground for Divorce**

¶28.    Bruce argues that the chancellor erred when granting Paula's request for a divorce based on habitual cruel and inhuman treatment. At trial, Paula bore the burden to prove her fault-based ground for divorce by a preponderance of the evidence. *Daigle v. Daigle*, 626 So. 2d 140, 144 (Miss. 1993). The Mississippi Supreme Court has classified habitual cruel and inhuman treatment as the following:

> Conduct that (1) **endangers life, limb or health**, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the offended party, or (2) is **so unnatural and infamous as to make the marriage revolting to the offended spouse** and render it impossible for that

17

spouse to discharge the duties of marriage, thus destroying the basis for its
continuance.

*Pittman v. Pittman*, 195 So. 3d 727, 732 (¶13) (Miss. 2016) (emphasis added) (internal quotation marks omitted) (citing *Richard v. Richard*, 711 So. 2d 884, 888 (Miss. 1998)). Additionally, the conduct must be more than mere unkindness, lack of affection, or incompatibility, and it must be routine and continuous. *Id.* "Although cruel and inhuman treatment usually must be shown to have been systematic and continuous, a single incident may provide grounds for divorce." *Kumar v. Kumar*, 976 So. 2d 957, 961 (¶14) (Miss. Ct. App. 2008) (citing *Rakestraw v. Rakestraw*, 717 So. 2d 1284, 1287 (¶8) (Miss. Ct. App. 1998)).

¶29.    Thus, "[j]ustice requires that the chancellor's primary inquiry must be into the ground for divorce with a dual focus upon 1) the conduct of the offending spouse and 2) the impact of that conduct upon the plaintiff." *Fisher v. Fisher*, 771 So. 2d 364, 367 (¶10) (Miss. 2000) (citing *Daigle*, 626 So. 2d at 144). The duel-focus inquiry is subjective, and "we concentrate on the conduct's effect on the particular offended spouse." *Gwathney*, 208 So. 3d at 1089 (citing *Harmon v. Harmon*, 141 So. 3d 37, 42 (¶16) (Miss. Ct. App. 2014)). The Mississippi Supreme Court has held that the standard of proof is steep but "certainly not impossible to satisfy." *Holladay v. Holladay*, 776 So. 2d 662, 677 (¶65) (Miss. 2000).

¶30.    This Court requires corroboration of the offensive conduct complained of by the moving party when seeking a divorce based on the ground of habitual cruel and inhuman treatment, except in unusual cases such as isolation. *Rawson v. Buta*, 609 So. 2d 426, 431

18

(Miss. 1992); *Heatherly v. Heatherly*, 914 So. 2d 754, 757 (¶12) (Miss. Ct. App. 2005). Additionally, "the corroborating evidence need not be sufficient in itself to establish the ground" but rather "need only provide enough supporting facts for a court to conclude that the plaintiff's testimony is true."[10]  Deborah H. Bell, *Bell on Mississippi Family Law* § 4.02[8][d], at 74 (2005) (citing *Anderson v. Anderson*, 190 Miss. 508, 200 So. 726, 728 (1941)).

¶31.  Here, the evidence of Bruce's conduct essentially came directly from Paula's testimony.  At the final divorce hearing on November 1, 2017, Paula described Bruce's behavior as follows:

> He was condescending and mean-spirited. [I]n the first part of the marriage, he was—he was fine, and then he started . . . as soon as he [became financially stable and more powerful], he started becoming very belligerent.  He would leave constantly and not have family time together and he would – he started getting to where he would get in my face and scream and in my daughter's face and just—just condescending . . . .  I mean, I would try to fix dinner every afternoon when he'd come home and sometimes he would just take it and push it back into the garbage can.

¶32.  Counsel for Paula stated, "I'm not going to go into everything because I'm just trying to put on just enough proof to satisfy the statute."  The court determined that it had sufficient

---

[10] In July 2017, the Mississippi Legislature amended Mississippi Code Annotated section 93-5-1 (Rev. 2018) to include "spousal abuse" within the term "habitual cruel and inhuman treatment."  2017 Miss. Laws ch. 427, § 6 (S.B. 2680).  The Legislature further stated that "[s]pousal domestic abuse may be established through the reliable testimony of a single credible witness . . . ."  *Id*.  Even under the amendment to the statute, the limited testimony of Paula, with or without corroborated evidence, was insufficient to establish habitual cruel and inhuman treatment under Mississippi law.

evidence and granted a divorce on the ground of habitual and cruel and inhuman treatment. The record lacks any other evidence that would rise to the level of habitual cruel and inhuman treatment. Interestingly, at the August 23, 2016 temporary order hearing, Paula testified, under oath, as follows:

Q: He was a good husband?

A: **Yes, he was a good husband.**

Q: Okay.

A: **He sure was.**

Q: Good [p]rovider?

A: Yes, he was.

Q: Okay. He took care of you?

A: Yes. And I took care of him.

Q: And took care of the child?

A: Yes. And so did I.

Q: Okay.

A: I was very good to him. **And I thought he was very good to me, too.**

Q: Okay. And you wanted to stay married to him, but according to your testimony until he at Christmas of 2014 said, we need to go our separate ways?

A: Yes.

(Emphasis added). Also at that same hearing, Paula stated that "October is when I decided

that I didn't want to be with him any longer. I knew that he was cheating on me and he knew that I knew it." The claim of knowledge in Paula's previous testimony directly contradicts her subsequent testimony in the November 1, 2017 final divorce hearing:

> Q: Up till today, do you know whether or not he has committed adultery?
>
> A: I'm not sure. I've suspected highly. I mean, I don't have photographs, but I've had people tell me and so forth and I just—just the treatment and the way he was pulling away, also.

¶33. At a hearing on October 5, 2016, Paula stated in her answer to interrogatories that in 2012, she had a stress-related heart attack from Bruce's conduct but never stated exactly what conduct of Bruce's caused her heart attack. Paula provided no corroboration to her claims of stress or emotional abuse by Bruce. In prior habitual-cruel-and-inhuman-treatment cases, emotional abuse was sufficiently evidenced by medical experts or medical records corroborating the plaintiff's testimony. *Faries v. Faries*, 607 So. 2d 1204, 1209 (Miss. 1992) (holding that the plaintiff's testimony of the defendant's emotional abuse, corroborated by a medical expert's findings, was sufficient evidence). After review, we find that the evidence presented as to habitual cruel and inhuman treatment does not rise to the level required by the law of the State of Mississippi.

¶34. Further, Paula failed to respond to Bruce's requests for admissions. On April 25, 2014, Bruce propounded the following requests for admissions to Paula:

> **REQUEST TO ADMIT NO. 10:** Please admit that your husband does not want a divorce;
>
> . . . .

21

**REQUEST TO ADMIT NO. 12:** Please admit that your husband has never engaged in conduct that created in you fear for your life;

**REQUEST TO ADMIT NO. 13:** Please admit that your husband has never engaged in conduct that created in you fear for your health;

**REQUEST TO ADMIT NO. 14:** Please admit that your husband has never, during the course of your marriage, engaged in conduct that was unnatural; and

**REQUEST TO ADMIT NO. 15:** Please admit that your husband has never, during the course of your marriage, engaged in conduct that was infamous.

The above admissions demonstrate a stark contrast to the testimony offered at the divorce proceedings. It is important to note that the requests for admissions tracked the caselaw defining habitual cruel and inhuman treatment. Paula did not attempt to deny them until Bruce filed a motion for summary judgment partly based on those requests for admissions. The court deemed those requests for admissions admitted by written order on October 6, 2016. The court found "all requests for admissions as admitted at this time." The court never issued another order allowing an untimely denial of those requests for admissions or granting a motion to alter or amend the order referenced above.

¶35. Rule 36 of the Mississippi Rules of Civil Procedure states that an untimely response to requests for admissions results in the matters being deemed admitted. Rule 36(b) states that "[a]ny matter admitted under this rule is *conclusively established* unless the court on motion permits withdrawal or amendment of the admission." *Id.* (emphasis added). The Mississippi Supreme Court has "reiterated that Rule 36 is to be enforced despite the fact that harsh consequences might result[.]" *DeBlanc v. Stancil*, 814 So. 2d 796, 801 (¶23) (Miss. 2002).

22

Thus, Rule 36 "is meant to provide, and should provide, an authoritative manner of procedure." *Id.*

¶36. In *DeBlanc*, the Mississippi Supreme Court noted that trial courts are given a degree of discretion in granting amendments or allowing withdrawals of admissions in proper circumstances to ameliorate harsh applications of the rule. *Id.* The supreme court, however, recognized that "[m]echanisms exist whereby a trial court *may* hold that an untimely response does not constitute a deemed admission because the trial court has broad discretion in pretrial matters." *Id.* (emphasis added). But, for cases involving "unexplained, untimely responses, the appellate courts of this state unanimously have emphasized that Rule 36 is to be enforced according to its terms." *Dillon v. PiCo Inc.*, 239 So. 3d 527, 533 (¶16) (Miss. Ct. App. 2017) (citing *Young v. Smith*, 67 So. 3d 732, 738 (¶10) (Miss. 2011)).

¶37. Here, Bruce's counsel propounded requests for admissions along with a notice of service of discovery responses to Paula's counsel on April 25, 2014. At the subsequent hearing on June 13, 2014, Bruce's counsel asked the court to "take judicial notice that there were [requests] to admit that were propounded on April 25 that still have not been responded to," and Bruce's counsel asked for the court to deem the requests admitted. Initially, Paula's counsel claimed they had answered the requests but acknowledged that his firm had recently hired a new secretary and would have to verify. After Bruce's counsel demonstrated that no answers had been filed, the chancellor reiterated Rule 36:

> Okay. Well, I'm sure you both know the rules with regard to that, that everything would be, if it has not been sent in, that which . . . has not been

23

answered or denied would be presumed to be admitted or accepted as admitted. Now, that's an answer. You have the right to amend your answer by a proper motion to do that. And of course, there are some guidelines for that as to good cause. So, you all can look at that and we'll take that issue up at another time.

In spite of the chancellor's advice in June 2014, Paula's counsel did not file for relief under Rule 36 until October 4, 2016—two years later in an attempt to respond to Bruce's motion for summary judgment based on those requests for admissions. Ultimately, as stated previously, the requests were deemed admitted in the order denying summary judgment in October 2016, but the chancellor never addressed the relief requested by Paula under Rule 36.

¶38. On review, the admissions were deemed admitted, and Paula testified at the August 23, 2016 hearing that Bruce was a "good husband." And at the November 1, 2017 hearing her testimony was that he was "condescending," "mean-spirited," and sometimes threw her home-cooked dinners in the garbage can. Quite simply, Paula's testimony did not rise to the level of endangering "life, limb or health," nor was it so "unnatural and infamous as to make the marriage revolting to the offended spouse." *See Pittman*, 195 So. 3d at 732 (¶13). We hold that Paula's testimony, as set forth in the record before this Court, was insufficient to grant a divorce on the ground of habitual cruel and inhuman treatment, and we therefore reverse the grant of divorce and remand this matter to the chancery court.

### b. Property Settlement Agreement

¶39. "It is well-established in Mississippi law that a property-settlement agreement is a binding contract between the parties." *Wilson v. Wilson*, 53 So. 3d 865, 869 (¶13) (Miss. Ct. App. 2011). Once the chancellor deems the provisions to provide adequately and sufficiently

24

for both parties, the agreement becomes incorporated into the divorce judgment. *Id.*

Thereafter, the agreement is "not modifiable absent fraud, duress, or a contract provision

allowing for modification." *Id.* With that said, the Mississippi Supreme Court has concisely

defined duress as it relates to contracts:

> Duress strikes at whether a party actually consented to a contract. A dominant party must conduct himself or herself in a manner that overrides the volition of the weaker party. [A] deprivation of a party's free exercise of his or her own will constitutes duress.

*Estate of Davis v. O'Neill*, 42 So. 3d 520, 525 (¶17) (Miss. 2010) (citing *Askew v. Askew*, 699

So. 2d 515, 518 (¶15) (Miss. 1997)). Importantly, "provisions in contracts contrary to public

policy or where obtained by **overreaching, duress, or undue influence** are unenforceable."

*Id.* (emphasis added) (quoting *First Nat'l Bank of Vicksburg v. Caruthers*, 443 So. 2d 861,

864 n.3 (Miss. 1983)).

¶40.    In *Wilson*, this Court held that the wife was not under duress due to certain safeguards

in place when she signed the contract. *Wilson*, 53 So. 3d at 870 (¶14). The safeguards in

place were having the presence of her own attorney with readily available advice, timing, and

being informed that the chancellor would hold a hearing that same day. *Id.* Similarly, in

*Estate of Davis*, 42 So. 3d at 525 (¶17), the aggrieved party alleged that the threat of criminal

prosecution induced the party's agreement. The supreme court, however, held there was "no

legitimate threat of criminal prosecution," and the party did not produce evidence suggesting

threat, coercion, or lack of sufficient safeguards. *Id.*

¶41.    The November 1, 2017 hearing began as a hearing to determine whether Bruce had

purged his contempt but was later transformed into a divorce proceeding. Bruce had been in jail since October 19, 2017, under the order to pay $105,470.67. Bruce had no attorney. The court stated, "Well why don't we let you two talk and then we'll worry about that in a little while, okay?" Apparently the parties met off the record (out of the courtroom) in an attempt to reach an agreement. Upon entering the courtroom, the following exchange occurred:

| | |
|---|---|
| Mr. Teel: | [Bruce] has an issue with something, and so we're at an impasse since we don't have an agreement. |
| The Court: | Oh, we are at an impasse? |
| Mr. Teel: | Yeah. |
| The Court: | Well, it's set for trial in January—no, March. |
| The Court: | You've got March or January? All right, then. Thank you. Well, I don't see that there's any other alternative that the Court has. I wonder, Mr. Lindsay, perhaps, I should bring you back in 30 days to see if we have reached any kind of accord with regard to whether or not you have been able to pay the judgement, whether y'all settle the case has nothing to do with— to you incarceration. |
| Bruce: | Your Honor— |
| The Court: | Just a second, sir. I'm going to get to you, I promise. |
| The Court: | I'm going to set this for 8:45. |
| Mr. Teel: | Okay. Thank you. |
| The Court: | Yes, sir. |
| Bruce: | **I concede. I'll agree.** |
| The Court: | Well, now—no, I don't—I'm not at all certain that you want to |

> do that, because it sounds to me like you are only doing that to get yourself out of jail.

(Emphasis added). The chancellor acknowledged that he did not want Bruce to sign the agreement simply to be released from jail, reiterating that the contempt and divorce settlement were separate issues. However, Bruce's only way out of jail was to sign the agreement, which was the sole basis of the chancery court's release order.

¶42. The property settlement negotiation and agreement occurred while Bruce was under an order of incarceration. The only way to obtain release from that incarceration was to pay Paula $77,657.25 for the first contempt amount, $5,000 for Paula's attorney's fees, and $27,813.42 for the second contempt amount. That means Bruce had to pay $105,470.67 before he could be released from jail. Bruce lost his job in 2015. Bruce lost his lawyer in September 2017. Bruce had a pending bankruptcy proceeding ongoing. When he balked at some of the requirements being imposed by Paula's attorney, the court told Bruce that he would be sent back to jail and that the hearing would be reset in March 2018. The court also stated, "[P]erhaps, I should bring you back in thirty days to see if we have reached any kind of accord." At a maximum, Bruce was then looking at potentially spending four more months in jail if the hearing was set in March 2018 or at a minimum thirty more days in jail if the court decided to schedule another contempt hearing. Bruce then stated, "I concede. I'll agree." Paula's attorney then read into the record what Bruce agreed to:

- Bruce agreed to pay $1,400 in child support per month;

- Bruce agreed to pay off any debts on the marital home and deed said

27

property to Paula;

- Bruce agreed to pay off all debts of the townhouse condo of the parties and then deed all the property to Paula;

- Bruce agreed to pay rent to Paula for that condo if he decided to live there;

- Bruce agreed to pay three different lump sum alimonies. The first in the amount of $450,000, at four percent interest if paid monthly by installments;

- Bruce agreed to pay a third lump sum alimony in the amount of $105,470.67, which represented the amount of the contempt judgment, for which he had been incarcerated for not paying. That third lump sum alimony incurred four percent interest if he paid in monthly installments;

- Bruce agreed to obtain life insurance for Paula's benefit in the amount of $1,000,000;

- Bruce agreed pay in full Pickering's expert fees and attorney's fees, the exact amount of which was unknown at that time but what later determined to be in the amount of $39,328.48 in expert fees and $34,658.08 in attorney's fees;

- Bruce agreed to pay Paula's attorney fees, the exact amount of which was unknown at that time but was later included in the judgment of divorce in the amount of $90,995.50;

- Finally, if Bruce "acquire any ownership interest in any of the former Louis Norman businesses (or successor businesses) Paula Lindsay shall be entitled to ½ that interest granted or agreed upon within five years of his years working at that company."

¶43. As previously stated, a deprivation of a party's free exercise of his or her own will constitutes duress, and "provisions in contracts . . . obtained by overreaching duress or undue influence are unenforceable." *Estate of Davis*, 42 So. 3d at 525 (¶17). On November 1, 2017,

28

Bruce had spent two weeks in jail because he could not pay $105,470.67. But on that same day, without a lawyer representing him, he agreed to pay approximately $905,000 in lump-sum alimony, pay the loan off on the marital home and the parties' condo and then deed those properties to Paula, pay $1,400 per month in child support, pay approximately $91,000 in Paula's attorney's fees, and pay off in full Pickering's expert fees and attorney's fees despite the court previously ordering those fees evenly split between the parties. If that were not enough, he also agreed that if he were to acquire an interest in a business within five years, that new interest would become marital property, and he would deed half that interest to Paula.

¶44. At the time of the November 1, 2017 hearing, the court knew that Bruce had lost his job, was claiming an inability to pay different amounts ordered by the court, had a pending bankruptcy petition, had no lawyer, and had been incarcerated for over two weeks. The court did not engage in any type of colloquy with Bruce to ensure that he was, in fact, consenting to the property settlement agreement free from duress or overreach.[11] According to Bruce, he could not afford to pay the $105,470.67, which resulted in his incarceration. Two weeks later, he was transported to jail and suddenly agreed to be responsible for well over $1,000,000 in financial obligations.

¶45. This Court does not attempt to curtail the power of a trial court to use the contempt

_____

[11] The court simply asked Bruce if he had initialed the agreement and if that was his agreement. No questions were asked about his financial difficulties, his ability to pay, the large sums, or if this was in fact an equitable distribution.

power to enforce its orders. Nor does this Court find fault with incarceration as a punishment for contempt. This Court is concerned with vague orders of trial courts and judgments of contempt including incarceration when those vague orders are alleged to have been violated. Likewise, when a person is held incarcerated for contempt, a court should be diligent and suspicious as to a sudden agreement of all divorce issues when the likelihood of duress and overreaching is possible, especially when the contemnor has no lawyer, no job, and has obvious financial difficulties. After a thorough review of the record, we hold that Bruce was under duress when he signed the property settlement agreement, and therefore the contract is unenforceable and should be vacated and is hereby set aside.

### 3.    Pickering's Fees and Attorney's Fees

¶46.    At the November 1, 2017 hearing, Bruce agreed to pay Pickering's expert fees and litigation costs.    That amount was later determined to be $39,328.48 in expert fees and $34,658.08 in attorney's fees. We already found that Bruce signed and agreed to the property settlement agreement under duress. Since we already set the property settlement agreement aside as a matter of law, so too are Pickering's expert fees and attorney's fees. Therefore, we reverse the chancery court's order that Bruce pay Pickering's expert fees and attorney's fees and remand this issue for further determination by the chancellor.

### 4.    Paula's Attorney's Fees

¶47.    At the November 1, 2017 hearing, Bruce also agreed to pay Paula's attorney's fees in the amount of $90,995.50. Since we already set the property settlement agreement aside as

30

a matter of law, so too are Paula's attorney's fees. Therefore, we reverse the chancery court's order that Bruce pay Paula's attorney's fees and remand this issue for further determination by the chancellor.

### 5. Attorney's Fees on Appeal

¶48. In her appellee brief, Paula requests attorney's fees of one-half of $90,995.50, which the chancery court awarded to her. *See Riley v. Riley*, 196 So. 3d 1159, 1164 (¶23) (Miss. Ct. App. 2016) (stating that "[g]enerally, on appeal this Court awards attorney's fees of one-half of what was awarded in the trial court"). On August 19, 2019, Paula filed a separate motion for appellate attorney's fees in accordance with the supreme court's opinion in *Latham v. Latham*, 261 So. 3d 1110, 1115 (¶23) (Miss. 2019) (requiring parties to file a separate motion for attorney's fees as set forth in Mississippi Rule of Appellate Procedure 27(a)). In her motion, Paula requests this Court "grant her attorney's fees in the amount of $45,477.75 with regard to this appeal."

¶49. Pursuant to Mississippi Rule of Procedure 36(a), "[i]f a judgment is reversed, costs shall be taxed against the appellee unless otherwise ordered." Therefore, because we reverse the trial court's judgment, we decline to award Paula attorney's fees or costs on appeal.

### CONCLUSION

¶50. Because we find the temporary orders were too vague to enforce, we reverse the chancery court's order of contempt. Further, we find that the divorce judgment is void for two reasons: (1) Paula failed to present sufficient evidence to prove her ground for divorce; and

31

(2) Bruce signed the property settlement agreement under duress. Finally, because we find that the divorce judgment is void, we find that both provisions in the divorce judgment requiring Bruce to pay Paula's attorney's fees and Pickering's fees and litigation costs are also void. Accordingly, we reverse and remand the chancery court's judgment.

¶51. **REVERSED, VACATED IN PART, AND REMANDED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, McDONALD, McCARTY AND C. WILSON, JJ., CONCUR. TINDELL, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., NOT PARTICIPATING.**